```
 1              IN THE UNITED STATES DISTRICT COURT
             FOR THE EASTERN DISTRICT OF VIRGINIA
 2                      Norfolk Division

 3

 4   - - - - - - - - - - - - - - - - - -
                                       )
 5   STEPHEN E. BILENKY,               )
     Administrator of the Estate of    )
 6   Frank S. Wright, Deceased,        )   CIVIL ACTION NO.
                                       )   2:13cv345
 7          Plaintiff,                 )
                                       )
 8   v.                                )
                                       )
 9   RYOBI, LTD., et al.,              )
                                       )
10          Defendants.                )
     - - - - - - - - - - - - - - - - - -

11

12

13                  TRANSCRIPT OF PROCEEDINGS

14                      Norfolk, Virginia

15                     November 24, 2014

16

17

18   BEFORE:  THE HONORABLE DOUGLAS E. MILLER
              United States Magistrate Judge
19

20

21   APPEARANCES:

22           SHAPIRO, LEWIS & APPLETON, P. C.
             By:  Richard N. Shapiro
23                     And
             SULLIVAN, MORGAN & CHRONIC, LLC
24           By:  Robert C. Sullivan
                  Counsel for the Plaintiff
25
```

```
 1    APPEARANCES CONT'D:

 2             DICKIE, McCAMEY & CHILCOTE, P.C.
               By:  Frederick W. Bode, III
 3                            And
               HARMAN CLAYTOR CORRIGAN & WILLMAN
 4             By:   John R. Owen
                    Counsel for the Defendants
 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1          (Hearing commenced at 2:32 p.m.)

2          **THE CLERK:**  Steven E. Bilenky, et cetera, versus

3     Ryobi, et cetera, et al., case number 2:13CV345.

4          Are counsel ready to proceed?

5          **MR. BODE:**  Yes, Your Honor.

6          **MR. SULLIVAN:**  Yes, we are.

7          **THE COURT:**  All right.  Good afternoon, everyone.  I

8     see I have, it's Mr. Sullivan, is that right?

9          **MR. SULLIVAN:**  Yes, Your Honor.

10         **THE COURT:**  And Mr. Shapiro, Mr. Bode, Mr. Owen.  Is

11    that right?

12         **MR. BODE:**  Yes, sir.

13         **THE COURT:**  And I'm sorry.

14         **MR. BODE:**  Your Honor, we have Sarah Cronin who is

15    in-house with Husqvarna.

16         **THE COURT:**  Nice to see you.

17         **MR. BODE:**  She used to be with the Sykes firm in

18    Louisville, Kentucky and recently took a position within the

19    last year, Sarah?

20         **MS. CRONIN:**  Yes.

21         **MR. BODE:**  With Husqvarna.

22         **THE COURT:**  All right.  Nice to have you.  Is it

23    going to be Mr. Sullivan and Mr. Bode primarily arguing?

24         **MR. SULLIVAN:**  It is for our side, yes, Your Honor.

25         **MR. BODE:**  Yes, Your Honor.

```
 1          THE COURT:  All right.  Well, Mr. Bode, it's your
 2    motion.  Well, I should say they are your motions, so I'm
 3    happy to hear from you.
 4          I've read everything, and I think I know essentially
 5    which way I'm leaning, but I'm open to persuasion, which is
 6    why I asked you to be here, and also to just give ourselves
 7    all a deadline well in advance of your trial so that you
 8    could know what final preparation you need to do.
 9          You're moving to exclude both Mr. Christoffersen and
10    Mr. Dyer entirely.  I assume you all haven't made any
11    progress on resolving this on your own, so you're still
12    looking for a ruling from me?
13          MR. BODE:  There have been no discussions since our
14    last meeting with Magistrate Miller, Your Honor.
15          THE COURT:  Okay.
16          MR. BODE:  So, yes, Your Honor, you're right, we are
17    clearly moving to exclude Mr. Christoffersen, and if you look
18    at Mr. Christoffersen's two reports, the one that he filed
19    and then the one that he filed at the end of August, Your
20    Honor, those reports are based entirely on the recalls,
21    completely on the recalls.  And it is such that in one of the
22    plaintiff's briefs, the plaintiff said that it wasn't
23    necessary for him to do any testing because he had -- and I
24    think we have quoted this -- why test when the research and
25    expert analysis shows that the failure mode was a defective
```

1    fuel system similar to the recalls.

2         So under the case law, and we have cited all the

3    Fourth Circuit cases, Your Honor:  *Cooper*, *Higginbotham*,

4    *Hodges*, the *Fireman's Fund* case, *Oglesby*.  If you look at all

5    of those cases, his opinion has to be reliable.  And his

6    methodology is completely flawed.  And all you have to do is

7    look at his methodology and ask the question, what is the

8    defect?

9         Mr. Owen, right before we came in here, and I were

10   talking in your conference room, attorney's conference room,

11   and John opened up to the last page of their subsequent

12   brief, and he said look how they have classified the defect.

13   He said the defect may be a fuel leak that might have been

14   caused by the pipe -- the hose coming off the fuel spud.

15        **THE COURT:**  But isn't there --

16        **MR. BODE:**  I'm sorry, Your Honor, go ahead.

17        **THE COURT:**  No, no.  Is there anything?  I mean, I

18   agree with you that it could be more clear, and those are the

19   questions that I have for Mr. Sullivan.  But is there

20   anything else that it could be besides a leak originating at

21   the connection between the fuel hose and, for lack of a

22   better term, I'll call it the spud, the nozzle that protrudes

23   from the gas tank?

24        **MR. BODE:**  Oh, absolutely.  And I frankly think

25   Mr. Dyer is absolutely wrong.  I don't think he followed 921

1   at all.  And he has to analyze all of the hypothetical causes

2   and then he has to, one by one, rule those out.

3          THE COURT:  We jumped from Christoffersen to Dyer,

4   and I was still on Christoffersen.  Christoffersen says, in

5   his supplemental report, that based on his experience as an

6   engineer working in the automotive field as well as with

7   beverage dispensers -- I grant you it may not be precisely on

8   point, but he claims to be an engineer.  His vitae clearly

9   qualifies him by education, training and experience to offer

10  opinions about these types of devices.  And he says based on

11  that experience that the nozzle in this case and the hose was

12  not adequate.

13         MR. BODE:  My response to that would be the fuel

14  tank could have been a victim of the fire and not the cause

15  of the fire.  And if he is going to say that, if he is going

16  to come to that conclusion, I'm not arguing his

17  qualifications, I'm arguing his methodology and the

18  reliability and the scientific testing and something that

19  somebody can duplicate or replicate so that he sets forth how

20  he did it, the pool test that he did or whatever.  He's done

21  none of that in his report.

22         And if you look at the *Hodges* case, which is --

23  that's the ladder case, there the expert said, oh, well, you

24  know, this ladder failed because it bent, and it either has

25  to have defective metal or it was improperly made.  And the

1    Fourth Circuit said no way, you don't just get to say your

2    *ipse dixit*, your conclusion.  They said you have to give some

3    scientific methodology, something that's reliable that can be

4    tested.  And, you know, Your Honor, it's the same thing in

5    *Cooper*.  *Cooper* was the test with the pedicle screws where

6    Dr. Mitchell, who, by the way, had never done a pedicle

7    screw, said, if you have nonunion, the pedicle screw is

8    defective.

9            And the Court said, well, what about the fact that

10   this guy was a smoker?  Couldn't that have caused the

11   nonunion?  And I would say to Your Honor, by analogy, what

12   about the fact that this may have been a plowed leaf fire and

13   that the gas tank burned up as a result of the fire at the

14   front of the mower?  It's entirely possible.

15           **THE COURT:**  I agree with all of what you just

16   described, but isn't that all just cross-examination of

17   Mr. Christoffersen's opinion and the other -- the ladder case

18   and the pedicle screw case are really -- what the holding

19   there is, this is *res ipsa loquitur*, and we don't follow *res*

20   *ipsa loquitur*?

21           Whereas, it appears to me what Mr. Christoffersen is

22   doing is, it may be only by the slightest degree, but he has

23   not just said a fire started and therefore it must have been

24   leaking gas.  What he had said is a fire started, I have

25   experiences in examining the design of nozzles adhering to

1   rubber hoses.  I've examined this nozzle and this rubber

2   hose, and I opined, based on my experience with these types

3   of connections, that this was the cause of the fire; the

4   nozzle and the hose being not properly designed.

5          In other words, he is saying more than just --

6   because in those cases there wasn't any dispute that the

7   thing contributed to the -- you know, there wasn't any

8   dispute about the cause.  There is a sharp dispute about what

9   caused this fire.

10          **MR. BODE**:  Well, actually, I don't know what

11   Mr. Christoffersen's theory is.  Is his theory that under --

12   because GM has a different way of hooking up a fuel line,

13   that the product is somehow made to be defective?  If that's

14   the case, Your Honor, under *Higginbotham*, which is the ladder

15   case, or *Hodges*, which is the bag fire case where there was a

16   large explosion, there has to be some scientific test other

17   than his I said it was so.

18          He has done no pool studies to examine when the hose

19   comes off or how this fuel leak occurred.  He has done none

20   of that.  And so there has to be something for us to test.  I

21   completely, but respectfully, disagree with Your Honor that

22   this is for cross-examination.  No, this is the gatekeeper

23   function of the Court.  And *ipse dixit* is not a theory;

24   because I said there had to be a fire doesn't get it done.

25   And it didn't get it done in *Cooper*, and it didn't get it

1  done in *Higginbotham*, and it didn't get it done in *Hodges*,

2  and it didn't get it done in *Fireman's Fund*.

3      **THE COURT**:  How is it different from what Mr. Wu

4  wants to say about the cause of the fire?  I mean, doesn't

5  Mr. Wu say essentially the same thing?  A fire occurred.

6  I've examined the evidence.  It's consistent with leaves

7  accumulating under the deck, and therefore it must have been

8  leaves accumulating under the deck.  How is it any different

9  for what Mr. Christoffersen wants to say about how the fire

10  started?

11      I mean, Mr. Wu didn't test the mower with leaves and

12  determine what the ignition point is against the manifold.

13  He didn't run a mower that had this kind of problem.  He

14  didn't conduct his own examination of what the evidence was,

15  other than just saying I've looked at what happened.  I

16  believe it was leaves under the mower deck.

17      **MR. BODE**:  Well, his report which is -- we only did

18  one report but his -- and he gave a deposition.  In his

19  deposition he came up with four hypotheses, including the

20  only hypothesis that Mr. Dyer came up with, which was a fuel

21  leak.  And he said what about the fact that there was 12- to

22  16-mile an hour winds with gusts to 24?  Under NFPA 921, you

23  have to address that.  And Wu said, what about the fact that

24  this is an air-cooled engine with a tremendous flow of air

25  that goes down around the engine?  What would that do to the

1    fuel vapor and where would it go?

2         And Mr. Wu's position is clear.  Under NFPA 921, you

3    have to identify all of the hypotheticals, and then you have

4    to talk about why they either are possible or not possible.

5    Here the fire marshal's ascertained that the cause was

6    indeterminate.  And Mr. Dyer has done no testing at all and

7    he hasn't -- other than to give the wind the back of his

8    hand, he has not addressed the downdraft fan.  He hasn't

9    addressed the wind speed.  He hasn't addressed anything other

10   than say, oh, well, that couldn't happen.  But Mr. Dyer and

11   Mr. Wu, of course, are experts on the fire.  To get to them

12   you first have to have a defect.  And here

13   Mr. Christoffersen's entire case was built on recalls.  And

14   Your Honor has dismissed all the recalls.

15        **THE COURT:**  For now.

16        **MR. BODE:**  Right.

17        **THE COURT:**  For now.

18        **MR. BODE:**  And, frankly, I think that's correct

19   because the 2001 recall was the materials of the tag.  That's

20   right.

21        **THE COURT:**  I mean, I recall that.

22        **MR. BODE:**  Sure.

23        **THE COURT:**  My only point was that that has been

24   objected to.  The plaintiff's entitled to have that looked at

25   again by the District Judge who, I'm sure, will give it his

1    own careful scrutiny.

2         **MR. BODE:**  Sure.

3         **THE COURT:**  You may end up having the same argument

4    again if the District Judge determines that I've erred in

5    excluding that information.  But I'm presuming that I haven't

6    erred.  That's what my usual practice is.  And I'm taking

7    issue, I guess, with the argument that Christoffersen's

8    report says nothing other than the recalls.

9         And I want to ask you to respond to the suggestion

10   that he also, he examined the lawn mower, and he rebuts some

11   of what your experts say is the alternate cause.  That is, he

12   said the evidence that the mower was kept in poor condition

13   and that the blade was in bad shape and that these things

14   would have contributed, that is, Mr. Christoffersen is

15   prepared to rebut some of that.  You would agree he has the

16   credential to do that, would you not?

17        **MR. BODE:**  I'm not here to quarrel with his

18   qualifications.  If we were to 104(a) him, I wouldn't

19   challenge him.  He is a PE.  But, I mean, and that goes to

20   weight.  This goes to whether or not he can testify.  And all

21   the things that you just mentioned, Your Honor, about the

22   blade and whether or not the grass bagger was filled, I mean,

23   I actually think you have to go to the scene and look at the

24   machine, and I don't believe Mr. Christoffersen ever did

25   that.  And if he did, he failed to find out that the chute

1    that was at the scene was in a box that was in the shed

2    house, and it was clogged with leaves inside the chute, and

3    the baggers that were on the back of the machine -- the

4    baggers burned up, but the leaves just fell straight down,

5    and there were two big piles of leaves, and there was also a

6    pile of leaves behind the machine.  And so, you know, all of

7    that goes to weight.

8         What I would say to Your Honor, and why we are

9    really quarrelling with Mr. Christoffersen, is he has not

10   identified a defect.  What is the defect?  That fuel somehow

11   escaped the fuel system?  How?  How much fuel?  Where does he

12   detail that?  Where is the report?  Where is the study?

13   Where is the analysis?  Where is the methodology?  It is not

14   existent.

15        And if he wants to talk about GM, then the case law

16   says that there has to be substantial similarity, and there

17   isn't, between a GM fuel system with fuel injection and a

18   fuel pump and a gravity-fed tractor, there is no similarity

19   there at all.  And he hasn't and never can at all address why

20   it is that the 18,000 other units made in a similar fashion

21   to this experienced no problems.

22        Go ahead, Your Honor.

23        **THE COURT:**  No, that actually brings up an important

24   question, which is something that we didn't run to ground

25   quite as well as I wish we had when we were looking at the

1    issue of no prior accidents.  What is Husqvarna's evidence of

2    that?  You say there have been -- there have literally been

3    zero reports of fuel leaks and mowers manufactured with this

4    system?

5              **MR. BODE**:  Yes, Your Honor.  Yes.  With this design

6    system.  Yes, Your Honor, exactly.  And we looked.  And, you

7    know, you would think you would see 1 or 2 out of 18,000;

8    none.  And Keith Degner will testify to that; none.  So they

9    have a computer database, and he examined it, and we examined

10   the model family, not just this one tractor but the model

11   family that had the same fuel system, same engine.  We went

12   through the model family; zero.

13            And that's telling because, as Your Honor knows, you

14   would expect if there was some defect after five years,

15   because this machine was made in 2005, and this incident did

16   not occur until 2010, December of 2010, you would expect that

17   there would be other problems.

18            With all of the recalls that occurred in '01, '04,

19   '06, those recalls were all caught very quickly and all

20   addressed very quickly by a manufacturer that really does

21   care and follows through with its responsibility.  And, you

22   know, Mr. Christoffersen is just saying I'm an engineer.  I

23   have experience with fuel systems.  I worked in the plastics

24   industry making soda pop bottles, and I say that it had to be

25   a fuel leak.

```
 1            And the Fourth Circuit says the court has a
 2   gatekeeping function, and it is your job to establish that
 3   there is a reliable methodology, and here it's just not
 4   reliable.
 5            THE COURT:  All right.  Let me hear from plaintiff's
 6   counsel.
 7            Mr. Sullivan.
 8            MR. SULLIVAN:  Yes, Your Honor.
 9            THE COURT:  It will be greatly helpful to me if you
10   can answer the question that Mr. Bode last put to me, which
11   is, what exactly does Mr. Christoffersen want to say is the
12   defect that he believes caused this fire?
13            MR. SULLIVAN:  And that's exactly what I'll address,
14   Your Honor.  And I think that there is -- I'm going to have
15   to talk a little bit about Smokey Dyer because it plays into
16   it, but that's where I'm going because I think there is a
17   mischaracterization or a misunderstanding of the process and
18   that our experts went through, which is more of a real world
19   process.  Smokey Dyer is a fire investigator with -- nobody
20   is going to argue about his credentials.
21            THE COURT:  Nobody is arguing about anybody's
22   credentials.
23            MR. SULLIVAN:  Sorry, Your Honor.
24            THE COURT:  No, no, that's all right.  Go ahead.
25            MR. SULLIVAN:  The way a fire investigator does
```

1    this, as I'm sure that you have had cases involving arson or

2    fire before, the investigator, when they are working for, you

3    know, a municipality, when they are not an expert, they go,

4    they examine what there is to examine about the fire.  And

5    they rely on burn patterns and whatever other evidence they

6    have, whether there is eye witness accounts, that whole body

7    of evidence that's collected from the actual fire, and the

8    fire investigator comes up with a cause and origin opinion if

9    they can.

10            Okay.  They do no testing to arrive at that.  Now,

11   we put people in prison for a long time based on that, so I

12   don't think any testing is required.  What happened in this

13   case, Smokey Dyer went through the exact same process that he

14   has his whole career.  He investigated the fire.  He came to

15   the conclusion, based on the evidence that he found, burn

16   patterns, testimonial evidence, Mr. Wright's wife, has

17   evidence of what she sees when she came out, the timing

18   that's involved, what she heard, whatever evidence was

19   collected in photographic evidence by the fire department,

20   the Chesapeake Fire Department's report, an inspection of the

21   mower, Smokey Dyer came to the conclusion that this was a

22   gasoline fuel-fed fire.  Okay.  And it originated in the area

23   of the left side, lower left side of the engine where the

24   melted aluminum is.  And he equates that melted aluminum to

25   that's where the pooling of the gasoline was.

1          Now, Mr. Wu disagrees.  He has that melting more and

2     being more hot because of oil.  But that's really just a

3     difference of the investigator's opinion.  That's the first

4     step.  Smokey Dyer does a normal fire investigation and says

5     the physical evidence, my opinion is, this is a gasoline

6     fuel-fed fire, okay, originated on the left side.  Then it

7     goes to Mr. Christoffersen --

8          **THE COURT:**  Well, before you move on to

9     Christoffersen, I don't read Mr. Dyer's report as saying

10    exactly that.  He definitely says it burned hotter on the

11    left-hand side.  And there is no question if it is relevant

12    at trial that this mower burned hotter on the left-hand side

13    than on the right-hand side, if that becomes a debate about

14    where the fire burned hottest, then it seems to me Mr. Dyer

15    gets to testify about his observations.

16         There may be substantial room for disagreement about

17    those observations, but the real question is whether that

18    fact is a fact at issue in the litigation; whether burning

19    hotter on the left is a fact at issue in the litigation,

20    because I don't think Husqvarna is going to take that the --

21    Home Depot or Ryobi is going to take the position that the

22    gasoline didn't burn up and cause a very hot fire near the

23    gasoline tank.  That's stipulated, what else does Mr. Dyer

24    get to say?

25         **MR. SULLIVAN:**  They have, in fact, taken that

1    position, Your Honor.  Their fire expert has said that there

2    is no evidence that there is any or more than a minute amount

3    of fuel in the gas tank, and perhaps -- because I actually

4    went through that in his deposition, Your Honor.  Well,

5    you're not saying there is no gasoline involved?  Eventually,

6    these lines are going to melt and the gasoline is going to be

7    released.  No, he won't accept that as a possibility because

8    he says we have no idea.  It might have run the last bit of

9    gas out of that tank right when this happened.

10        So that's actually not conceded.  I believe that --

11    I don't have Mr. Dyer's report right here in front of me but

12    I do believe that he attributes that to a release of

13    gasoline, although he --

14        **THE COURT:**  Here's what he says.  He says, "The

15    material first ignited was gasoline vapor that came from

16    liquid gasoline that had flowed from the fuel tank."  I think

17    there is a lot Mr. Dyer can offer about the things you just

18    described in terms of the intensity of fire, but I don't see

19    anything in his report that gives him that first ignition

20    piece of evidence.  I don't see what he's relying on to say

21    that, unless it's Mr. Christoffersen, unless

22    Mr. Christoffersen gets to testify that that's what it was.

23        **MR. SULLIVAN:**  Right, and I believe what he is

24    relying on, Your Honor, is -- well, melted aluminum,

25    evidence -- you know, physical evidence that there is

1    evidence that gasoline was released.  I think that's all he

2    is saying, if I phrased it more than that.

3        **THE COURT:**  I mean, because your reply, and this is

4    very important to the way I anticipate writing this after we

5    are done is, your reply suggests that all he wants to say is

6    this was a gas-fed fire.  This was an intense hot fire

7    consuming a lot of gas or a significant amount of gas, and

8    that is explained by the intensity of the flame or fire on

9    the left-hand side where the fuel system was located and his

10   observations of the burn patterns, and so forth.

11       But I don't see anything in his report that would

12   permit him to say it was first caused by igniting gasoline

13   vapors.  I just don't see how he gets that from -- obviously,

14   there was a fire, and there was a gas tank that is now gone.

15       So if there was gas in that gas tank, it was

16   consumed -- or stands to reason that it was consumed and it

17   would have burned hotly, but I don't know.  That's what the

18   experts are there to say.

19       **MR. SULLIVAN:**  And I understand, Your Honor, and I

20   think it's the next step that bridges sort of the gap there.

21   Then once Smokey Dyer comes up with the opinion, you know,

22   even if it's just that, this is a gasoline fuel-fed fire, not

23   saying when or how, then it goes to the engineer because

24   that's not supposed to happen.  I mean, that's the simple,

25   I'm talking about my process of what I want to find out

1    what's going on.  Okay.  It's a gasoline fuel-fed fire.

2    You're not supposed to have a release of gasoline in a mower

3    ordinarily like this, so engineer, Mr. Christoffersen, how

4    can this happen?  Looking at this mower, is there anything

5    about this mower that makes this more likely to happen, that

6    makes it -- there are defects?  Look at this.  He then does

7    the full analysis that he had, and even leaving aside the

8    recall, because I don't think that he's dependent on the

9    recall to do his engineering analysis, he comes up that more

10   probably than not if there is a gas -- accepting what

11   Mr. Dyer says, this is a gasoline fuel-fed fire, where did it

12   come from and how did it come, get released, and he goes

13   through his opinions and arrives at -- as you have said.

14            And I do believe the recall, although the recall you

15   have ruled that that's not relevant, and even if relevant,

16   unfairly prejudicial, I understand that ruling.  I don't

17   think that that prevents an expert from relying on the

18   information that was gathered by the company, regardless of

19   if he says recall.

20            For instance, for example, one of the letters to the

21   government in the 2004 recall is saying that, you know, an

22   abrasion from the clamp on the fuel tank can cause a leak,

23   and there actually are three incidents of that.

24            **THE COURT:**  That precipitated the 2004 recall.

25            **MR. SULLIVAN:**  '04 I believe, Your Honor, yes.

1              So I believe whether or not anyone comes in and says

2       recall, which you have ruled is not going to be said, that

3       doesn't mean an engineer, in looking at the history of it,

4       sees the same fuel tank, the same spud, the same clamp, the

5       same fuel line having an issue like that of saying, well, you

6       know, the company is looking at that and had notice that this

7       combination caused a leak.

8              He also relies on -- I know he talks about it in his

9       report the type of barb.  I know Husqvarna, the manufacturer,

10      calls it a barb that holds it on there, is something that's

11      sort of unique to injection molding.  You can't make a sharp

12      angle with injection molding.  It has to pop out of the mold.

13      And that is inadequate for securing the fuel line, so it's

14      got a weak connection there.  He also has personal experience

15      of a cracking in the fuel tank.

16             **THE COURT:**  I mean, I frankly disagree with you,

17      Mr. Sullivan, that the evidence of the recalls has any

18      relevance to what Mr. Christoffersen is going to say.  And I

19      know, I read your brief, your supplemental brief, and you may

20      persuade Judge Jackson that I've made an error and he would

21      permit this or even more, but in my view, the only reason any

22      of that would have relevance is if it were -- if the recalls

23      had relevance.

24             Because it isn't relevant to the engineer that a

25      clamp abraded a gas tank unless the clamp is located in the

1    same way to abrade the gas tank on this model.  And so far as

2    I've seen, there is absolutely no evidence that that's the

3    case.

4            If what you're saying is Mr. Christoffersen wants to

5    say injection molding has problems, making a tight bend like

6    this is problematic in injection molding, I know that from my

7    experience in injection molding, and I've examined this tank,

8    and I've examined other tanks, and based on my experience in

9    the beverage industry, or whatever, I believe this is a

10   defectively designed spud.

11           That seems, to me, to be consistent with his

12   education, training and experience, perhaps relevant to the

13   issues of what caused the fire.  But one of the problems that

14   I have, and I think Mr. Bode is struggling with, too, is that

15   Mr. Christoffersen won't say that.  He wants to say, I don't

16   know.  It could be a number of things.  And he kind of hems

17   and haws around nailing anything down.  How are they supposed

18   to cross-examine him if he won't say what the defect is?  Is

19   he willing to say that's it?

20           **MR. SULLIVAN**:  I think this is what he will say,

21   that at least from talking to him that I believe is his

22   opinion.  I don't know if he is clear enough in his report.

23   His deposition obviously wasn't taken so there is -- there

24   weren't questions to it, but I believe what he is saying is

25   he is trying to be, in other words, realistic.  All of the

1  evidence is burned.  So he obviously -- I mean, I wouldn't

2  find it credible for an expert to say the clamp failed and

3  the hose fell off and released gasoline.  What he is saying

4  is that that connection, all right, because of exactly what

5  you said, the injection molding not being able to have a

6  barb, the fact that it's one piece instead of a fitting with

7  a barb that allows that entire thing to be subjected to heat,

8  makes plastics more brittle, vibrations over time, that there

9  was a release of gasoline from a separation there of the hose

10 from the fuel tank.

11         Now, what I don't think he is going to -- well, I

12 know he is not going to offer, and he is not saying, is that

13 he can say the precise manner, and otherwise the hose slid

14 off, or, you know, the vibrations worked it off, or it

15 cracked off because of the connection.

16         What he is saying is the connection failed, that he

17 is certain of or at least to the degree that he is required

18 as an expert.  To say the precise manner when the entire

19 thing is burned, I think, is not really possible because we

20 can't go back and look at it.  But what he is saying is the

21 weak point in that system there is that connection for these

22 reasons.

23         All right.  And for these reasons, and looking at

24 the connection, and understanding that Mr. Dyer, you know,

25 has a release of gasoline, and also burning hot on that side

1   of the engine, where it would come from, is directly pointed

2   at it, that his opinion is, to a reasonable degree of

3   certainty, that that connection failed.  I think that's his

4   opinion.  I think that's based on his experience.  I think he

5   can make that entirely without ever even seeing the recall or

6   any of these recalls, I think he can render that opinion.  I

7   believe that -- it seems to me that some of the argument from

8   the defense is his qualifications kind of masked his

9   methodology or basis because they seem -- I mean, if we're to

10  hold expert -- we are not to hold experts to standards in the

11  courtroom that professionals in their actual field, when they

12  are not being paid to do this, would be held to, at least I

13  don't think we are.  You know, for example, Smokey Dyer, to

14  run a test to see how wind would affect things.  The

15  Chesapeake Fire Marshals did not do that to determine this.

16         **THE COURT:**  No, I don't think he was saying that

17  Smokey Dyer had to run a test.  I think he was saying that

18  Smokey Dyer had to make an observation about why the wind

19  wouldn't have dissipated the gasoline vapors.  And all Smokey

20  Dyer does is say vapors ignite faster than leaves and

21  therefore it must have been vapors, but I don't think he was

22  suggesting that he had to run a test.

23         **MR. SULLIVAN:**  But, I mean, one of the things that I

24  think he is saying, and this is a -- I mean, I think he says

25  in his rebuttal report that it's just not possible for a fire

1   of this intensity to start from leaves.  I believe -- I'm

2   paraphrasing, obviously.

3          THE COURT:  Well, yeah, and that goes back to -- I

4   mean, there is no question that Mr. Dyer believes that gas

5   burned up in the fire and that that made it more intense.

6   But the difficulty that I have with what he wants to say is

7   not so much that it was an intense fire.  It's that he

8   doesn't appear to have any good information about what caused

9   it to ignite in the first instance.

10         MR. SULLIVAN:  Meaning what -- okay.  I believe it's

11  the -- and, again, I have his report here.  I don't want to

12  take time to flip through it, and you seem to know it very

13  well.  I believe that he at least listed contact with hot

14  surface or hot manifold.

15         THE COURT:  He does say that.  He does say that, but

16  unlike -- I mean, he does say that, but I don't see where in

17  his report he has factual support for that other than he sort

18  of distinguishes Mr. Wu's opinion and says I don't think it

19  would have been the leaves, and gas burns faster than leaves.

20  But obviously gas is supposed to be in a gas tank, and there

21  is nothing in Mr. Dyer's report to suggest how gas would have

22  gotten out of the gas tank in the first instance, unless he

23  is relying on Mr. Christoffersen's opinion that the barb hose

24  connection was a problem that caused the gas to leak onto the

25  mower.

1          **MR. SULLIVAN:**  I think what he is doing, Your Honor,

2    is similar to what -- I mean, if the courtroom -- there was a

3    fire in the courtroom, okay, and there was some question of

4    whether there was gasoline, someone was trying to set it on

5    purpose, okay.  A fire investigator could come in, look at

6    the physical evidence, and say wait a minute.  Gasoline,

7    pooling gasoline here, based on my physical examination,

8    damage, areas of heat, was where this fire started, okay, and

9    wouldn't need to have more than that, than the physical

10   evidence to look at to do that.

11          I think that what -- I mean, it's clever in some

12   ways of Mr. Wu, but when he uses the NFPA standard or

13   methodology to come up with this idea that all of these

14   hypotheses have to come up with, you have to come up with

15   them, and you have to rule them out.  Well, you don't have to

16   rule out hypotheses, unreasonable hypotheses.  And, frankly,

17   the idea -- I mean, at least to Mr. Dyer, who's been in this

18   business 50 years, the idea that some leaves caught on fire

19   and set a man on fire such that his entire clothing was

20   burned off him is not a hypothesis based on the damage of the

21   mower, and what he found physically to the victim is not a

22   hypothesis that is reasonable and does not really have to be

23   tested to be ruled out.

24          **THE COURT:**  I understand, but it's not their burden

25   to show what caused the fire.

1          **MR. SULLIVAN:**  I understand.

2          **THE COURT:**  And there isn't any dispute that a fire

3    occurred and that that fire consumed a gas tank.  The

4    difficulty that you're having and that I'm having, frankly,

5    is what caused that fire to begin.  I, frankly, think none of

6    the experts have a great explanation for what caused it to

7    begin.

8          **MR. SULLIVAN:**  And I think, Your Honor -- from

9    having taken Mr. Wu's deposition and going through this with

10   him, is why it's a different understanding for me.  Because

11   what Smokey Dyer says is that for exactly the reasons you

12   said, leaving aside how it starts, the intensity, the burn

13   patterns, gasoline was involved, okay.

14         Mr. Wu's opinions fleshed out in his deposition

15   essentially, when I asked him, well, how many leaves started

16   this fire?  He said, well, I don't know.  I said, well, a

17   hundred leaves?  Well, I don't know.  I said, could it have

18   been as few as five leaves?  He said, yes, it could have been

19   as few as five leaves.

20         He also told me he has no evidence, and he is not

21   conceding that there was any gasoline in the tank that was

22   ever released, that it might have been running to just a

23   hair's breadth of empty.  Now when you view that, you know,

24   isolated, saying, well, it could have been leaves from

25   friction, it sounds real good, until we hear that it's really

```
 1    not a realistic opinion or hypothesis that has to be ruled

 2    out.

 3            I think what Chief Dyer is saying, in contrast to

 4    that, is there is no other way you get this kind of a fire

 5    with the intensity in the time that Mrs. Wright hears --

 6    various different descriptions of what she hears, but it's

 7    the ignition of gasoline is what -- I don't think anyone will

 8    disagree with.

 9            THE COURT:  Well --

10            MR. SULLIVAN:  No, I think they said an exploding

11    tire, I apologize.  I correct myself on that.  Hears that and

12    comes out, that there couldn't be anything else other than

13    gasoline that would burn the mower like that and start a fire

14    that a person would not be able to get off the mower.

15            THE COURT:  Mr. Wu says it was oil that burned

16    that -- that it was oil escaping from the cylinder head

17    after --

18            MR. SULLIVAN:  Very late.

19            THE COURT:  -- to the fire.

20            MR. SULLIVAN:  Yes, very late in the fire.  I think

21    that the problem with that is that he has to get there with

22    burning of a few leaves, and I think it's just a hypothesis

23    that is -- you know, someone could come up with a hypothesis

24    that, although is a bright, clear, sunny day with no storms

25    for hundreds of miles, that a lightning bolt struck it and
```

1    caught it on fire, too, you wouldn't have to disprove that.

2         They are raising these theories with Mr. Wu when the

3    fundamental determination that something was started by

4    gasoline is somewhat, for an investigator, a matter of what

5    else could have started this?  And Smokey Dyer doesn't find

6    it reasonable.  I think he says that in his rebuttal report,

7    that leaves could have started a fire that would have burned

8    a mower like this, even if it compromised late in the fire.

9    It's got to be big enough to compromise the tank also.  So at

10   any rate, Your Honor, I think that a little bit diverts from

11   Mr. Christoffersen.

12        **THE COURT:**  I understand.  I think I understand what

13   your points are, but let me ask you, just so that I get it on

14   the record, the issue of his Poulan mower.  There really

15   isn't any dispute that the Poulan mower was -- because that's

16   a separate motion to limit his testimony about his own mower.

17   The reason he made those observations about his own mower is

18   because it was part of the 2001 recall, correct?

19        **MR. SULLIVAN:**  Yes, Your Honor.

20        **THE COURT:**  Okay.

21        **MR. SULLIVAN:**  Yes.

22        **THE COURT:**  So I don't read Mr. Christoffersen's

23   report as saying anything other than his 2001 mower leaked,

24   and since that was a component of the 2001 recall, it seems

25   to me that testimony would be encompassed with the Court's

1  ruling regarding the 2001 recall.

2        **MR. SULLIVAN:**  I think in part.  Here's what I do

3  think is valid about his experience and even would be, I

4  think, relevant, leaving aside the recall.

5        He has a mower.  His mower developed a cracking from

6  vibrations and a leak at that connection, okay, a very

7  similar, if not exact same design connection as what we have

8  in this case.  So he experienced it over a -- what he found

9  to be not outside the useful life of the product, okay, that

10  that would experience vibrations, crack.  He received a fuel

11  leak.  I don't think as an engineer viewing that saying this

12  is what I've seen in looking at this, you know, this

13  connection, there is a problem with either the connection or

14  the materials, whatever he determined when he looked at that.

15  Then he finds that they recall and change that.  That's the

16  point where I think that your ruling says, okay, he is not

17  going to talk about that.

18        The fact that he has an experience with a very

19  similar or substantially similar product, I don't think that

20  that is necessarily something that -- that's a personal

21  experience that he has that essentially confirms his opinions

22  that, yes, this occurs with this type of connection.

23        **THE COURT:**  Well, except that the reason he has a

24  personal experience is because the tank was made out of a

25  defective plastic, and Mr. Wright's tank was not made out of

1    a defective plastic.  What I was -- you know, frankly, if

2    Mr. Christoffersen had filed a rebuttal report and said I

3    know my Poulan was made of the defective plastic but I've

4    nonetheless examined the type of plastic in Mr. Wright's

5    mower and find that it would be subject to the same type of

6    problems because of X, Y and Z, but that's not what he did.

7    He just wants to say my Poulan leaked and therefore

8    Mr. Wright's mower leaked.  And as I've tried to analyze in

9    my prior opinion, I don't think there is enough similarity

10   between the reasons for that '01 recall and the current

11   mower, the Ryobi mower that caused or that was consumed in

12   this fire.

13         **MR. SULLIVAN:**  And I do understand your ruling, Your

14   Honor.  I was just -- the only characterization I was making

15   as substantial similarity of the recall as opposed to

16   substantial similarity of just an other incident of this

17   happening, and also I think that going to this motion but not

18   necessarily coming into evidence or being testified to by

19   Mr. Christoffersen is, this is another piece of knowledge to

20   consider that he has, even if he says, well, that's a

21   different material, they changed the material, I don't know

22   whether the materials are exactly the same, how they changed

23   it, but yet this type of connection a failure, I think he can

24   have that in terms of a basis to support his opinions,

25   whether he says it or not.  Because experts can rely on all

1    sorts of things to form the basis of their opinion if we are

2    challenging their methodology or their qualifications or

3    their basis that aren't necessarily going to be said in

4    court.

5         **THE COURT:**  Well, yeah, I understand that.  But, I

6    mean, if they are not going to be said in court, that's fine.

7    If he is not going to come in and say, my Poulan leaked and

8    therefore this leaked, there is no problem.  If he wants to

9    say it leaked, he needs to be able to say why it leaked.  And

10   so far the barest thread that I see in Mr. Christoffersen's

11   testimony is, is his connection to injection molding and

12   nozzle design and beverage industry and his opinion that this

13   connection as a one-piece connection shouldn't have been

14   designed this way.  I, frankly, think it's a thin, thin read

15   if he is permitted to testify.

16         And with regard to Mr. Dyer, as you have limited his

17   testimony here, if all he wants to do is say I've examined

18   the scene, I've examined the consumed lawn tractor, and I'm

19   of the opinion that gasoline contributed to this melted

20   alloy, that it burned much hotter on the left, and all the

21   things that he wants to say about it being a gas-fed fire, it

22   would appear to me he has the qualification to do that and

23   that might be of assistance to the trier of fact but only if

24   that is a relevant fact at issue in the case.

25         And most likely with respect to what Mr. Dyer wants

1    to say, I would write my order with a view to limiting it

2    solely to that opinion and reserving the relevance

3    determination for that opinion to the trial judge.  Because

4    you have said it's going to be relevant because they are

5    going to dispute it.  But what Mr. Bode has said in his

6    papers is no one disagrees that this was a gas-fed fire.  So

7    I'm going to ask Mr. Bode about that.  But understand that if

8    Mr. Dyer, if I determine -- I'm only making the expert

9    inquiry.  I'm not determining relevance, unless Mr. Bode

10   concedes it, which I think is highly unlikely.  So I wanted

11   that to be clear.

12        **MR. SULLIVAN:**  And I think just for the -- I think,

13   yes, I am saying that, Your Honor.  Just in addition to that,

14   I think I am saying that he does have the ability and should

15   be allowed to give the opinion that there is no other

16   reasonable cause for this fire if not the ignition of

17   gasoline as the first material ignited.

18        The only other thing there, frankly, are the leaves,

19   and it's in dispute factually, but let's just assume that the

20   leaves that Mr. Wu talks about are there.  The only other

21   material there, that can be ignited besides engine oil, which

22   is conceded by Mr. Wu, does not come until late in the fire

23   when the plastics burn through.  The only things that the

24   experts have come up with that can burn, okay, are leaf lawn

25   material and gasoline.

```
 1              And what Chief Dyer, and I think he's -- I think he
 2    gets at it in the rebuttal opinion, that this can't be a fire
 3    that started from leaves and lawn material.  It's just not
 4    consistent with any of the burn patterns, any of the damage,
 5    the intensity of the fire, the spread of the fire.
 6              THE COURT:  He does say that.
 7              MR. SULLIVAN:  That being --
 8              THE COURT:  And I think that's permissible for him
 9    to say.  If Mr. Wu testifies, it would be permissible for
10    Mr. Dyer to rebut that testimony, but he still doesn't have
11    any way of explaining how the gas got out of the tank, at
12    least he doesn't.
13              MR. SULLIVAN:  Right.
14              THE COURT:  Now, if Mr. Christoffersen is permitted
15    to say it did, then maybe Mr. Dyer can say that would be
16    consistent with my observations at the scene.  But I don't
17    think anything in Mr. Dyer's observations give him the
18    ability to say, as a matter of the first opinion, that it
19    began with gas leaking out of the tank.
20              MR. SULLIVAN:  And I think that the part that I will
21    tell you if certainly he is not going to say, is it began
22    with leaking out of the line, leaking out of the tank,
23    leaking out of here, it is within his expertise to say that
24    the first material ignited was gasoline.  It's no different
25    than if he does an arson investigation.  Nobody knows what
```

1    was in the room, and as a result of the investigation,

2    determines that, you know, this is the first material ignited

3    and started the fire.

4           Now it's not within his qualifications to say that a

5    failure in that tank dumped it onto there.  But it is within

6    his expertise, and it's frankly what the fire investigators

7    do, is to determine, well, this was a gasoline fire, this was

8    not a gasoline fire, this was some other material, it's the

9    cause and origin of fire, and they base that on the physical

10   evidence.

11          And one of the ways of doing that is what Mr. Bode

12   is suggesting, that they have to consider what else can make

13   a fire this intense that we have this happen to the mower

14   this quickly?  Well, the only thing on the mower is gasoline

15   that can do that, and then he can match that with the burn

16   patterns and say, well, yes, gasoline was ignited as the

17   first fuel ignited.

18          To say where it came from, that's what I was

19   starting to explain in the beginning, that's what he does.

20   Then we say, okay, how did this happen or how could this have

21   happened?  Could something with the way the mower designed

22   cause this to happen, and you go to Mr. Christoffersen.

23   Anyway, I just wanted to clarify.  I think we both understand

24   each other.  I just wanted to make sure I wasn't --

25          **THE COURT:**  Well, I'm going to write something so --

1        **MR. SULLIVAN:**  I understand.

2        **THE COURT:**  -- you're not going to be stuck with

3   just my comments from the bench.  I have a feeling this is

4   going to be examined again, too, so I'll write something.

5        Did you have anything else you wanted to say,

6   Mr. Sullivan?

7        **MR. SULLIVAN:**  The one thing I just wanted to add is

8   just sort of as a matter of record and not arguing really, if

9   anything, just that Mr. Christoffersen, in terms of what he

10  relied on to arrive at his opinions, among the things are,

11  you know, documents of the manufacturer, any admissions,

12  design drawings, any materials produced by the defendant

13  directly from the manufacturer, admissions and statements of

14  engineers of manufacturer, two of which one former engineer

15  now expert witness, one current engineer who were deposed,

16  and Mr. Christoffersen, at least in terms of when we get to

17  his rebuttal report, has consideration of those.  He also

18  examined exemplar mowers.  He examined the subject mower.  He

19  relied on fact witness statements and testimony.

20       **THE COURT:**  Now, see, you just changed your

21  operative verb there.  There is no question that he examined

22  a whole wealth of material.  But when you say he relied on,

23  that's a much, much narrower, narrower class of material, and

24  that's really the problem that Mr. Christoffersen has, is

25  that it doesn't matter if he read an encyclopedia of lawn

mower design and built this lawn mower himself, if he doesn't

rely on that expertise in forming his opinion.

And that's why I say, to the extent he is relying on

something, what appears to me to be still a viable issue

after the recalls is he knows injection molding, he knows

nozzle design, he knows this type of connection, and relying

on that expertise, he wants to opine that this connection was

bad.  But the fact that he examined exemplar mowers and this

mower and the documents from the manufacturer, he isn't

relying on any of that because none of that supports his

opinion that this was a defective design.

And so that's really the issue, that I think if he

is permitted to testify, it's going to be very circumscribed

by what he really did rely on, not every single thing he's

examined, because he didn't rely on a lot of what he

examined, or to the extent he did, I've determined that they

are not sufficiently similar to permit him to rely on them.

**MR. SULLIVAN:**  And I obviously don't want to reargue

that, Your Honor, and I didn't mean for there to be a

distinction.

**THE COURT:**  I wanted to make sure you understood

that I know that Mr. Christoffersen, that there is a wealth

of material here.  There is a lot of evidence that he's

examined, and some of what he examined is relevant to other

opinions he wants to offer.

1           I know he wants to talk about the maintenance of the

2    mower and its condition when Mr. Wright operated it, and to

3    the extent these matters get litigated, I believe he did rely

4    on the condition of what he examined to offer some of those

5    opinions.

6           **MR. SULLIVAN:**  That's all that I'm saying, Your

7    Honor.  I wanted just to make sure that -- I mean, whether or

8    not things are found relevant or not, at least he -- his

9    opinions, he says he relies on these things, I completely

10   understand your ruling, Your Honor, and relying on things

11   that you deem not relevant you find not to be an issue.  I

12   just wanted to put on the record that he did, at least in his

13   opinion, he relies on these things.

14          **THE COURT:**  Okay.

15          **MR. SULLIVAN:**  All right.  Thank you.

16          **THE COURT:**  Mr. Bode.

17          **MR. BODE:**  Briefly, Your Honor.

18          **THE COURT:**  Certainly, and you don't need to spend

19   any more time on the Poulan mower issue.  I don't have any

20   difficulty excluding Mr. Christoffersen's testimony about the

21   Poulan mower.  But let's talk about Mr. Christoffersen.

22          **MR. BODE:**  Okay.

23          **THE COURT:**  I think you have a sense of the

24   direction I'm leaning.

25          **MR. BODE:**  So, Your Honor, first of all, the

1    plaintiff has the burden of proof.  And it is one thing to

2    say, look, this is how we do it in the real world, but, you

3    know, and that's sort of what I heard from Mr. Sullivan in

4    his argument.  But if you look at *Kumho Tire*, and you look at

5    the *Cooper versus Smith and Nephew* case, in that case, Your

6    Honor, the Court held that the expert has to follow the same

7    level of intellectual rigger in the courtroom as in the

8    field.  And I go back to what I said at the beginning of my

9    remarks, Your Honor.  There is nothing in his report,

10   nothing, that says what the defect is.  Your Honor has

11   pointed to one thing where he says, well, maybe it's this

12   barb or the way this injected fuel is designed.

13          And I say, okay, that could be tested.  He could

14   have done that.  He did not do it or maybe he did it and his

15   tests didn't turn out the way he wanted to, and that's why he

16   hasn't put it in his report.  I don't know, Your Honor.  But

17   I know this, under the case law in the Fourth Circuit, we

18   have to have testing that has a methodology that's reliable

19   that can be duplicated, and we have none of that.

20          **THE COURT:**  If he wants to testify about a test,

21   then it has to be reliable and capable of duplication.  But

22   not every expert is going to engage in testing.  I mean, I

23   understand your point, but I don't think it's a question of

24   every single expert observation is capable of testing, or if

25   it is capable of testing, that the expert actually has to

1  test it.

2        I agree that it's a thin, thin report, Mr. Bode,

3  but let me just present it to you this way, the way

4  Mr. Sullivan presented to me.  There isn't any dispute that a

5  fire happened on this lawn mower and that that fire came into

6  contact with gasoline.  And those facts are not going to be

7  in dispute, and that is not supposed to happen.  And so

8  what Mr. Christoffersen is trying to do is the same thing

9  that your experts are trying to do, which is to explain why

10  they believe it did happen in this instance.

11        **MR. BODE**:  Mr. Wu will say we don't know how much

12  gasoline was in the tank, and no one does.  Because we know

13  this, we know that Mrs. Wright has testified that her husband

14  couldn't put any gasoline -- he couldn't service the mower

15  anymore.  And we know that the gas tanks were found in the

16  garage and they still had dust on them.  So no gas had gone

17  into that tractor that day.

18        And we know, according to their own briefs and their

19  own report and Mr. Christoffersen's report, that he had been

20  operating the mower for an hour.  So Mr. Wu has said we have

21  no idea how much gas was in there, and he has said the

22  left-sided burn could have been the oil, just as Your Honor

23  pointed out.

24        The fire marshals said the cause was indeterminate.

25  It is not the defendant's burden of proof.  It is the

1    plaintiff's burden of proof, and under the clear Fourth

2    Circuit case law, and it's every case, they have to have some

3    scientific methodology and come forward and say what is the

4    defect and how it's defective.  And here not only do they

5    have no testing to establish that it's defective, they have

6    counter-evidence that is admitted, which is there are 18,000

7    other tractors in this model family and zero other fires,

8    zero other fuel separation lines from the nipple.

9         So just to say -- just to say that he has that

10   theory because of something that he saw on a car is not fair

11   because the Fourth Circuit says, if you're going to compare

12   apples to apples, it can't be apples to oranges, and you have

13   to prove, you, the plaintiff, have to prove substantial

14   similarity.

15        **THE COURT:**  If my ruling stands, you've already won

16   that battle, Mr. Bode.  But there has now been one fire among

17   these 18,000 mowers, right.  There is at least one of them

18   that burned up --

19        **MR. BODE:**  That's true.

20        **THE COURT:**  -- and killed a person.  It's

21   unfortunate.  It's tragic, but it happened.

22        **MR. BODE:**  Everything you've just said I completely

23   agree with.

24        **THE COURT:**  Okay.  I'm assuming Husqvarna doesn't

25   have any other reports of one burning up because the leaves

1    caught on fire under it too, right?  There is no history of

2    these mowers catching on fire for any reason?  This one did.

3           **MR. BODE:**  That is true, but this one was, in

4    candor, operated by an 88-year old man who couldn't remember

5    what he had for breakfast in the morning, whose wife had

6    buzzers on the door so that she would know if he went out,

7    who couldn't walk, who couldn't extricate himself from the

8    machine when it caught on fire, and the plaintiff has to have

9    a reliable theory with methodology that can be tested.  And

10   this isn't Mr. Bode saying this; this is the Fourth Circuit.

11   And they have evaluated this.

12          So, look, Dyer completely relies on Christoffersen.

13   He says maybe the fuel spud came off.  Maybe, that is -- it

14   has to be to a reasonable degree of engineering certainty.

15          **THE COURT:**  Have you deposed Dyer?

16          **MR. BODE:**  No, and he is limited to his report, and

17   so is Christoffersen.

18          **THE COURT:**  Right.  I'm fine with what you've just

19   said about Dyer.  I don't believe Mr. Dyer would be permitted

20   to testify as to the fuel leaking from the gas tank as being

21   the original source of ignition.  But he does offer a lot of

22   information about the burn patterns that he observed, the

23   intensity of the fire.  It sounds to me like some of that

24   could well be contested and subject to dispute.

25          The bottom line issue, and I know -- you know,

1    you're going to have another bite at this apple, too, if you

2    want, and you might want to go ahead and get on Judge

3    Jackson's docket.  Maybe he can hear all this together.  But

4    if Christoffersen is permitted to say that he found the

5    fuel-to-nozzle connection defective because of what he's

6    observed, particularly in his rebuttal report about his

7    experience with the way it was designed; it was a one-piece

8    molding and not a two-piece molding, and the barb wasn't

9    sufficient, and in his view that's what caused it, if he is

10   permitted to say that, then all this other evidence that

11   Mr. Christoffersen and Mr. Dyer want to offer becomes

12   relevant to respond to Mr. Nielsen and Mr. Wu.

13          Because there is a lot in their reports that rebuts

14   Husqvarna's alternative theories of how the fire was caused.

15          **MR. BODE**:  I mean, everybody agrees that the fire

16   started not back at the gas tank but up at the exhaust

17   manifold.  And Mr. Dyer isn't going to say anything about

18   that if my objection to that -- if we were to try this case

19   would stand because he doesn't describe how the fire started.

20   Because gas vapors at the gas manifold, the gas manifold's

21   temperature -- he doesn't have any of this in his report.

22          **THE COURT**:  The exhaust manifold.

23          **MR. BODE**:  Yeah, the exhaust manifold is not hot

24   enough.  So there would have to be something else.  His

25   report, Mr. Dyer's report is absolutely silent on that, other

1    than to just *ipse dixit* say it started at the exhaust

2    manifold.  The exhaust manifold on this tractor is on the

3    right front of the engine.  The gas tank is behind the engine

4    and above the engine.

5          But Dyer relies on getting gas vapors somehow to the

6    front of the machine.  We don't have a defect.  We don't have

7    anything that we can test or analyze or examine from

8    Mr. Christoffersen, and his report is silent on it.  And when

9    challenged on that, the plaintiff said what I said before.

10   I'm not going to repeat it other than, you know, we have all

11   of these recalls.

12         So, Your Honor, it's absolutely clear that under all

13   of the case law and *Cooper*, *Higginbotham* and *Hodges*,

14   *Fireman's Fund, Oglesby*, every one of them, there has to be

15   something that rises to the same level of intellectual rigger

16   in the courtroom as in the field, and that has to have a

17   clear reasoning or methodology that is scientifically valid.

18   And for Mr. Christoffersen to just say it, doesn't make it

19   scientifically valid.

20         **THE COURT:**  Let me ask you one more question.

21         **MR. BODE:**  Yes, sir.

22         **THE COURT:**  I know you're getting tired.

23         **MR. BODE:**  No, I'm not.  I'm not at all.  I'm

24   actually enjoying this.

25         **THE COURT:**  Okay.  Good.

1          **MR. BODE:**  Yeah.

2          **THE COURT:**  Because there is one other subject that

3    we haven't talked about, and that is the replacement fuel

4    tank.  And I know your position is -- well, I don't know what

5    your position is.  What is your position?  Why wouldn't

6    Mr. Christoffersen be able to say in his experience,

7    coincident with his experience with injection molding and him

8    thinking this nozzle design was not proper, that Husqvarna

9    introduced a replacement tank that was sold to people who had

10   this mower, the recall -- I mean, the right mower, and that

11   that replacement tank utilized a different design and that

12   different design is evidence that it knew its first --

13   regardless of the other three recalls, that it's evidence

14   that it knew the same things that Mr. Christoffersen wants to

15   opine, based upon his experience in dispensing beverages,

16   that is, that the injection molded, one-piece barb was not a

17   good design and so it redesigned it?

18         **MR. BODE:**  So two points there.  In 2006 when they

19   began having problems with the low-perm tanks and fuel lines,

20   they went back to the old fuel line.  That was their initial

21   fix with the CPSC, when they did the recall.  They went back

22   to the fuel line that Mr. Wright had on his tractor.

23         Now, five years later, when this fire happens, if

24   you order a replacement tank, you're now subject to the laws

25   of the EPA, the laws of the State of California, which say in

```
 1    order to keep gas vapor fumes from getting up into the
 2    atmosphere, we are going to have low permeation fuel tanks
 3    and low-permeation fuel lines, and Husqvarna knew that that
 4    was coming, which is why they made the switch in 2006.
 5    Unfortunately, the first set up of low-perm fuel tank,
 6    low-perm fuel line, they had to go back to the non-low-perm
 7    fuel line because of the slippage problems that they had.
 8    And then they redesigned the whole thing to accommodate the
 9    EPA and the State of California.
10         But none of that has anything to do with whether or
11    not this tractor at the time it left the manufacturer was
12    defective.  And it wasn't because it had a tried and true
13    fuel system, 18,000 of which never had a problem, and so
14    there is nothing defective about this tractor.  The fact that
15    you can now get a different fuel tank is simply because the
16    EPA mandates that all fuel tanks be low-perm fuel tanks and
17    all fuel lines be low-perm fuel lines.
18         THE COURT:  So they are not making any fuel tanks
19    any more that do not use low-perm fuel lines?
20         MR. BODE:  Is that right?  I'm wrong?
21         MS. CRONIN:  No, you're correct.
22         MR. BODE:  They are not.  I think that's right, Your
23    Honor.  I mean, I understand I am an officer of the court,
24    and I understand I'm making statements here, and I want to be
25    right.  I don't believe that they are making anything other
```

```
1   than low-perm fuel tanks and fuel lines under the EPA rules
2   and the California rules.
3        THE COURT:  It's important because to me the issue
4   of the replacement tank is not completely encompassed by the
5   Court's prior ruling on the recalls.  That is, because I
6   understood there were two things going on:  One, they changed
7   the tank to address this low-perm fuel line issue, but that
8   they also stopped making the other tank, even in markets
9   where low-perm fuel lines were not required.  That is, they
10  changed everybody's tank and sold one product.  Now, there
11  may be good business reasons to do that.
12       MR. BODE:  I think Dan Nielsen testified -- and I
13  don't have the years now or anything else, but I think in his
14  deposition someplace he said that in '08 or '09 the EPA
15  passed the rule, the regulation that all fuel tanks, fuel
16  lines had to be low perm.  And so I don't really think that
17  it was any issue other than they had to go to low perm and
18  they knew it.
19       THE COURT:  Okay.
20       MR. BODE:  Based upon the regulations.
21       THE COURT:  I'm going to give Mr. Sullivan -- it's
22  really Mr. Bode's motion so you don't get a chance to
23  respond, but I'll give you a chance very briefly to address
24  this issue, because it is important to me.  And what I'm
25  going to ask you to do, Mr. Bode, is would you file a
```

1   supplemental exhibit to that effect that whatever, you know,

2   give me two pages, and if you need, a short declaration of

3   why the two-piece tank is in use across all models.

4          MR. BODE:  I'll be delighted to.

5          THE COURT:  Mr. Nielsen has testified that it was

6   adopted because everyone had to use low-perm fuel lines.

7   That would be an important fact for me to understand in

8   connection with the relevance of that two-piece tank.

9          MR. BODE:  Yes, and I'm -- I may be -- there is a

10  lot of evidence here, and I may be remembering it wrong, but

11  I think it's in his dep --

12         THE COURT:  If you are, I'm not going to hold it

13  against you in the least because it wasn't -- you weren't on

14  guard that I was going to inquire about it.  But I'm

15  interested to know the exact fact, which is why I want you to

16  research it and file it.

17         MR. BODE:  It will be done tomorrow, but I will tell

18  you that I think it's in the deposition that Mr. Sullivan

19  took of Mr. Nielsen.  I think he asked him that.

20         THE COURT:  All right.  Mr. Sullivan, if you want to

21  say something very briefly limited solely to that issue of

22  the two-piece tank, I'll let you respond.  What's your

23  recollection of the evidence on that subject?

24         MR. SULLIVAN:  Well, I'm going from -- I did take

25  fairly lengthy depositions of Mr. Nielsen and also

1    Mr. Degner, who's currently at Husqvarna, and both of

2    which -- I think Mr. Degner was a little newer at this time,

3    but they were both there when this actually happened at

4    Husqvarna, so they do have more than just knowledge that they

5    gained from someone educating them.

6            As I recall, this model lawn mower, Ryobi model lawn

7    mower that we have in this case, was never one that was ever

8    given low-perm lines, ever.  And that now if you order or --

9    well, at least now, but sometime ago, too, I think that the

10   parts manuals will document farther back in time, you order

11   the replacement tank for it, you get the one that we are

12   discussing, the two-piece replacement tank.

13           I believe, whether it's Mr. Degner or Mr. Nielsen, I

14   will have to go back and check.  I'm fairly certain that when

15   they tried to relate it to the low-perm issue, and that,

16   well, now we changed it not because of an issue with the

17   tanks but because the EPA said we had to use low-perm on

18   everything.  I believe what they said to me -- and this is a

19   credibility issue of whether that's -- whether that story is

20   quite true, I said, well, when -- if you have this Ryobi and

21   you order the new tank and they send you the replacement,

22   okay, you don't get a replacement fuel line if you just buy a

23   replacement tank.

24           So then you put the low-perm one on with your old

25   fuel line, saying that you have never replaced it.  So now

1   you have a non-low perm with a low-perm tank, and there was a

2   whole discussion of whether maybe that would be an issue that

3   they said, but everybody got this low perm or not low perm.

4   And I believe the testimony is either that they didn't or

5   they do not know.  Do they always send that with a low-perm

6   line because that's a requirement?  And these are the guys

7   who would know.

8           THE COURT:  Okay.  Well, I'm going to ask you to do

9   the same thing.  If you could submit a very short, I mean,

10  two- or three-page supplemental filing, and if you want to

11  attach some excerpts from Mr. Degner or Mr. Nielsen's

12  deposition, but no more than five or six pages.  I can't

13  imagine it went on more than that.

14          So if you want to submit a short supplemental filing

15  articulating your view of the two-piece tank issue, I'd like

16  to know what the actual evidence is of that because I know

17  that the two-piece tank was more broadly used than just on

18  the recall tractors.  And that may be relevant evidence for

19  me to consider in ruling on whether Mr. Christoffersen gets

20  to opine.

21          MR. SULLIVAN:  I will do that, Your Honor.

22          THE COURT:  All right.

23          MR. SULLIVAN:  Mostly going to be citations to their

24  depositions, which I'll provide copies of and citations.

25          THE COURT:  All right.  Well, I know Thanksgiving is

1   coming up.  I'll give you until -- how about by Wednesday of

2   next week to get that in?  Is that all right?

3            **MR. SULLIVAN:**  That's fine for us, Your Honor.

4            **THE COURT:**  Mr. Bode?

5            **MR. BODE:**  Yes, Your Honor, that's fine.  And,

6   frankly, Your Honor, I actually agree with what counsel said

7   on the fuel tank.  I think he is -- I think he is right.  If

8   you order it today, you're going to get the fuel tank.  But,

9   you know, remember, he is right, they never changed the 2005

10  model because that model was made back in 2005.

11           **THE COURT:**  I understand.

12           **MR. BODE:**  Frankly, this tractor didn't have a new

13  fuel tank and this tractor didn't have a new fuel line.  This

14  tractor had the fuel line that was made when it was built in

15  2005.

16           **THE COURT:**  Right.  But it is still relevant to me,

17  at least in my mind, in analyzing the experts, what they want

18  to say is, is the reason they adopted that two-piece tank,

19  because everyone was now moving to low-permeation fuel line?

20           **MR. BODE:**  The answer to that is yes.

21           **THE COURT:**  Okay.  Okay.

22           **MR. BODE:**  Thank you, Your Honor.

23           **THE COURT:**  You're welcome.  And thank you all for

24  your cordial argument and well-documented briefs.  I'm going

25  to, after I get your supplemental exhibits, get you something

1    in writing, which will detail my thoughts, and you will have

2    an opportunity to review that and take it up again.

3            What I would suggest -- you all can proceed however

4    you want, but in terms of efficiency, it may make more sense

5    to wait until you get that in before you go forward with your

6    objections on the other end, just bring it all to Judge

7    Jackson at one time.

8            Because probably one of you is going to be unhappy

9    with whichever way I go on this one, too.  And Judge Jackson

10   asked me to weigh in on this because I had already become

11   familiar with it in the course of preparing for the final

12   pretrial conference.  He obviously will dive into them to the

13   extent you raise objections to what I've ruled and apply the

14   appropriate standard in deciding whether I've made an error.

15   I'm sure he would welcome whatever arguments you all want to

16   present to him on all of those subjects.  But I will -- and I

17   think you can already sense which way I'm going on this, that

18   is, that I'm going to exclude the Poulan lawn mower

19   testimony.

20           To the extent Dyer is permitted to testify, it's

21   going to be a narrow range of testimony consistent with what

22   has been proffered in the reply brief, and I will reserve the

23   relevance determination to the trial judge.  Because I don't

24   know, frankly, whether a lot of what he is going to testify

25   to will be relevant to a fact at issue in the litigation.

1              The issue with Christoffersen is a closer call.  I

2    want to scrutinize it more closely.  I want to examine the

3    case law that's been cited to me again and see how you all

4    relay this two-piece tank.  To the extent he is permitted to

5    testify, it's going to be on a very, very narrow part of his

6    opinion with respect to defect.  And if that testimony is

7    permitted, then he would be able to offer more opinions

8    concerning the opposition to what Mr. Nielsen wants to say.

9              But the last thing I'll say is that I think that

10   this is an extremely difficult case for the plaintiff.  And I

11   think it's an extremely difficult case even to reach the jury

12   on liability, and all of what Mr. Bode has also said is

13   totally apart from whether there has been any proof of defect

14   here, that is, the very, very, very compelling case for

15   contributory negligence in this case.

16             All of that, though, is apart from defect.  That is,

17   Mr. Wright's physical condition, his ability to quickly exit

18   the lawn mower when this fire did happen, all of those things

19   suggest to me that this is a case that the plaintiffs ought

20   to seriously consider resolving.  And I know you all have

21   made an effort with Judge Tommy Miller in the past, and I

22   strongly encourage you to revisit that.

23             If you think another session with Judge Miller would

24   be helpful, I encourage you to request one.  I'm sure he will

25   be happy to sit with you again in trying to resolve the case.

```
 1   It's a tragic, tragic thing and a horrific death that
 2   Mr. Wright suffered, but I think that the plaintiff has an
 3   extremely difficult liability case given the evidence that
 4   was left after the fire and given the record of the
 5   manufacturer of this particular mower.
 6        Even if they succeed in reaching the jury on
 7   liability, I think the contributory negligence case is
 8   extremely compelling, and I strongly urge the plaintiffs to
 9   think about another sit-down with Husqvarna and maybe see if
10   you can't get this case worked out.
11        But I will get you an opinion as promptly as I can
12   after your supplemental exhibits that you will have time to
13   consider that, arrange whatever review you feel needs to be
14   arranged with Judge Jackson, and be ready for trial in
15   January if it doesn't get resolved.  All right.
16        MR. SULLIVAN:  Thank you, Your Honor.
17        MR. BODE:  Thank you, Your Honor.
18        THE COURT:  Thank you all.  Court's in recess.
19        (Hearing adjourned at 3:50 p.m.)
20
21                    CERTIFICATION
22
23     I certify that the foregoing is a correct transcript
24
25
```

from the record of proceedings in the above-entitled matter.



            X_____/s/ Tamora Tichenor____x

                        Tamora Tichenor

                        X___12/12/2014 _x

                                Date