STEPHEN E. BILENKY, ADMINISTRATOR      )
OF THE ESTATE OF FRANK S. WRIGHT,      )
DECEASED,                              )
                                       )
     Plaintiff,                        )
                                       )
v.                                     )     Civil Action No.: 2:13-cv-345
                                       )
RYOBI TECHNOLOGIES, INC.,              )
                                       )
     and                               )
                                       )
HOME DEPOT U.S.A., INC.,               )
                                       )
     Defendants.                       )

## RYOBI TECHNOLOGIES, INC.'S RULE 59(b) (AMENDED) MEMORANDUM IN SUPPORT OF ITS ALTERNATIVE MOTION FOR NEW TRIAL

### Introduction

Ryobi Technologies, Inc. has moved for judgment as a matter of law on several grounds,

which the Court should grant. To the extent, however, that the Court declines to do so, then this

motion raises the following issue and sub-issues:

> Under Rule 59, the Court may grant a new trial where the verdict is against the clear weight of the evidence, based on false evidence, or will otherwise result in a miscarriage of justice; where the jury reached their verdict on an incomplete theory of law or with improper instruction; and where substantial errors occurred in the admission and exclusion of evidence. Remittitur, or in the alternative a new trial, is also warranted with excessive damages. Here:

- the plaintiff presented false evidence in the form of dissimilar incidents, including involving different fuel system designs that he misrepresented as being substantially similar to the Wright tractor, to support his arguments of product defect and notice;
- the discovery sanctions of the "admission" combined with the exclusion of defense expert Dan Nielsen were unwarranted and disproportionate, resulting in material prejudice by the introduction of a dissimilar incident with incomplete and inaccurate information, and what was tantamount to

1

the striking the defense's case, all while barring evidence to explain the lack of similarity;

- the defense was improperly precluded from relying on relevant and sufficient evidence of Mr. Wright's mental and physical impairments as well as improper tractor maintenance to support its contributory negligence defense, and that error was compounded by the instruction that such evidence was insufficient as a matter of law;
- material, relevant, admissible evidence was improperly excluded, including evidence of the tractor's compliance with industry standards and Mr. Wright's medical records, while improper evidence was allowed, including that the company the defendant's expert worked for had received $79 million from a different client over the years;
- the plaintiff's counsel engaged in repeated misconduct throughout his closing—including improper "send a message" arguments, invoking xenophobia, and calling the defense liars—which drew sustained objections, *sua sponte* interruptions by the Court, and an admonishment from the bench; and
- the jury, inflamed by the plaintiff's counsel's improper closing, returned an excessive and unsustainable verdict.

Given all of these errors, should the Court grant a new trial? The answer is yes.

Each of these errors standing alone warrants a new trial, given the prejudice, fundamental lack of fairness, and miscarriage of justice. In combination, they leave no other option. This verdict was not the product of a fair and just trial, due in large part to the serial misconduct and errors introduced by the plaintiff and his counsel. Thus, if the Court doesn't grant judgment for Ryobi Technologies as a matter of law, it should vacate the judgment and order a new trial.

## Argument

Rule 59 allows a court to "grant a new trial on all or some of the issues" after "a jury trial, for any reason for which a new trial has heretofore been granted in an action at law in federal court."[1] Grounds for a new trial include "that the verdict is against the clear weight of the evidence, that the damages are excessive, that the trial was not fair, or that substantial errors occurred in the admission or rejection of evidence or the giving or refusing of instructions."[2]

---

[1] Fed. R. Civ. P. 59(a)(1).
[2] 12 Moore's Fed. Practice § 59.13[1].

A motion for new trial allows a court to consider the weight of the evidence, as opposed to viewing the evidence in the light most favorable to the prevailing party.[3] A court must also set aside the verdict and grant a new trial, even though supported by substantial evidence, if it believes the verdict is based on evidence which is false or will result in a miscarriage of justice.[4] A court also properly grants a new trial where the jury was improperly instructed on a theory of liability and reached their opinion on an incomplete theory of law.[5] In addition, "a district court has broad discretion to grant a new trial when necessary to prevent injustice."[6]

There is also interplay between the defense's Rule 50(b) renewed motion for a judgment as a matter of law and this new-trial motion. "If the court grants a renewed motion for judgment as a matter of law, it must also conditionally rule on any motion for a new trial by determining whether a new trial should be granted if the judgment is later vacated or reversed."[7] In addition, in light of the defense's renewed motion for judgment as a matter of law, the Court "must state the grounds for conditionally granting or denying the motion for a new trial."[8]

Here, numerous manifest errors as well as improper conduct by the plaintiff's counsel compel a new trial to prevent what would otherwise be a miscarriage of justice by allowing this verdict to stand. Ryobi Technologies is entitled to judgment as a matter of law. Should the Court grant that motion, then it should also rule on and conditionally grant a new trial limited solely to the issue of alleged negligence against Ryobi Technologies. And should the Court deny judgment as a matter of law, it should nonetheless grant a new trial only on the issue of alleged negligence against Ryobi Technologies.

---

[3] *Cline v. Wal-Mart Stores, Inc.*, 144 F.3d 294 (4th Cir. 1998).

[4] *Poynter v. Ratcliff*, 874 F.2d 219, 222–23 (4th Cir. 1994); *Gill v. Rollins Protective Servs. Co.*, 773 F.2d 592, 594 (4th Cir. 1985).

[5] *Wyatt v. Interstate & Ocean Transp. Co.*, 623 F.2d 888, 892 (4th Cir. 1980).

[6] 12 Moore's Fed. Practice § 59.13[1].

[7] Fed. R. Civ. P. 50(c)(1).

[8] *Id.*

I.     **The plaintiff's incorrect statements concerning other incidents involving dissimilar products resulted in the introduction of inadmissible evidence, which the plaintiff used to argue incorrectly that the defense had prior notice of a dangerous condition.**

The improper admission of evidence at trial may warrant the grant of a motion for new trial, particularly when the evidence is prejudicial.[9] A new trial is also warranted where the verdict rests on false evidence or will result in a miscarriage of justice.[10] In particular, a violation of a clear and specific *in limine* order that prejudices the other party warrants a new trial.[11] Indeed, courts often grant new trials in whole or in part based on violations of *in limine* orders.[12] Here, the verdict was based on improperly admitted evidence of other dissimilar incidents involving tractors and fuel systems that Magistrate Judge Miller deemed inadmissible. The plaintiff misled the Court as to the nature of this evidence, allowing for its admission over objection, resulting in material prejudice to the defense and reversible error. Permitting the verdict to stand based on such improper evidence and conduct would be a miscarriage of justice.

There was extensive pre-trial motions practice on the inadmissibility of evidence of other incidents involving certain models and designs of other tractors, fuel systems, engines, and issues involving them, including unrelated recalls.[13] That motions practice resulted in the exclusion of a significant volume of materials that involved dissimilar tractors and unrelated issues. Specifically, by his October 2014 order, Magistrate Judge Miller excluded all evidence of three recalls of Husqvarna-manufactured tractors.[14] One of those recalls addressed an issue involving the placement of a fuel-line clamp in tractors with Briggs & Stratton engines, in which the "fuel

---

[9] 12 Moore's Fed. Practice § 59.13[2][b][i][E].

[10] *Gill*, 773 F.2d 592.

[11] *See CSX Transp., Inc. v. Peirce*, 974 F. Supp. 2d 927, 935 (N.D. W. Va. 2013).

[12] *E.g.*, *United States v. Van Eyl*, 468 F.3d 428, 429 (7th Cir. 2006); *Park W. Galleries, Inc. v. Global Fine Art Registry, LLC*, 732 F. Supp. 2d 727, 750–51 (E.D. Mich. 2010).

[13] (*See* Pl.'s Mot. in Limine (ECF No. 51); Defs.' Mot. in Limine to Exclude All Reference to Recalls (ECF No. 54).)

[14] (Order on Admissibility of Evid. of Recalls (ECF No. 107).)

pump was mounted on the rear of the cowling."[15] As he noted, in "some tractors, one of the clamps that held the fuel line in place was so close that it rubbed against the fuel tank," and over time, "with natural vibrations from operating the tractor, the clamp would wear an abrasion through the fuel tank and cause the tank to leak."[16] However, this "recall affected only Husqvarna-branded lawn tractors utilizing the Briggs & Stratton engine."[17]

The magistrate judge also correctly noted that Mr. Wright's tractor had a Kohler engine—not a Briggs & Stratton Engine.[18] The Wright tractor also had a gravity-fed fuel system—not a fuel pump, as with the Briggs & Stratton engines.[19] Thus, none of the four fuel-line clamps in the Wright tractor "were positioned to abrade the model's 2.0 gallon fuel tank"—i.e., the Wright tractor was designed differently such that it would not and could not manifest the condition noted in the recall covering the Briggs & Stratton-engine models.[20] Indeed, the parties agreed "that Mr. Wright's 2005 Ryobi model tractor, though manufactured by Husqvarna, was not included in any of the three recalls."[21]

Following instructive case law, the magistrate judge concluded that evidence regarding the three recalls was not sufficiently similar to be properly admissible, and that any probative value was substantially outweighed by the risk of unfair prejudice.[22] As the judge noted, "Mr. Wright's tractor featured a Kohler engine with no fuel pump," and its "fuel line routing was entirely different and Kohler engines that do feature a fuel pump situate it on the engine's side,

---

[15] (*Id.* at 2.)
[16] (*Id.* at 2–3.)
[17] (*Id.* at 3.)
[18] (*Id.*)
[19] (*Id.*)
[20] (*Id.*)
[21] (*Id.* at 4.)
[22] (*Id.* at 6.)

not its rear."[23] Most important, the judge noted, "the Kohler-equipped tractor had no fuel line clamp positioned immediately adjacent to the wall of the fuel tank"[24]—i.e., there was nothing to abrade the fuel tank and cause a leak. Thus, "Mr. Wright's tractor lacked the 'legally operative' problem that precipitated the 2004 recall" involving tractors with the Briggs & Stratton engine.[25]

The magistrate judge also addressed the plaintiff's arguments of purported similarity. As he explained, the plaintiff argued that "the 2004 recalled tractors and Mr. Wright's tractor had the same fuel tank, but that argument misses the operative fact about the 2004 recall. The 2004 recall addressed _positioning_ of the _clamp_ relative to the fuel tank."[26] The magistrate judge explained that what "matters in assessing the admissibility of these recalls is the precise defect in the previously recalled tractors that makes evidence of the recalls 'legally operative' or probative."[27] And since the plaintiff failed to show that the issue in the 2004 recall was the same or substantially similar to his limited defect theory of a fuel line separating from the fuel tank, "the tractors recalled in 2004 are not substantially similar to Mr. Wright's tractor, and the Court will exclude evidence of the 2004 recall."[28]

Magistrate Judge Miller also rightly concluded that evidence concerning the recalled tractors was inadmissible under Rule 403,[29] writing that the "principal concern here is the dangerous inference the court sought to avoid in _Olson_ [_v. Ford Motor Company_][30]—that simply because the component parts in some of the manufacturer's products have been the subject of

---

[23] (_Id._ at 12.)
[24] (_Id._)
[25] (_Id._ (citing _Landis v. Jarden Corp._, 5 F. Supp. 3d 808, 813 (N.D. W. Va. 2014)).)
[26] (_Id._ (emphasis in original and citation omitted).)
[27] (_Id._ at 14.)
[28] (_Id._ at 12.)
[29] (_Id._ at 14–15.)
[30] 410 F. Supp. 2d 869 (D.N.D. 2006).

recalls, the subject product was likewise defective."[31] The magistrate judge therefore concluded that "the risk that jurors will infer that because Husqvarna tractors have been recalled in the past, Mr. Wright's tractor must have been defective is too high when weighed against the probative value of evidence of recalls of different model tractors with materially different parts."[32]

Despite that clear and well-reasoned ruling, and despite his knowledge of the materially different circumstances and designs of those other tractors, the plaintiff continued to push to admit evidence at trial concerning dissimilar incidents involving the recalled tractors. During his direct examination, Husqvarna engineer Steve Brinkman explained that Husqvarna changed the design and components of the fuel line in Mr. Wright's model of tractor to comply with new environmental requirements from the Environmental Protection Agency and the State of California, which required the use of a low-permeation fuel line.[33] The plaintiff argued that this testimony opened the door to cross-examination on other incidents of fuel-line separations in certain designs of tractors.[34] The Court explained that the plaintiff was entitled to cross-examine Mr. Brinkman on "whether there were any fuel line separations on the old—on the model that's before the Court"—i.e., fuel-line separations in which the same fuel line that was installed in the Wright tractor separated from the same fuel tank that was installed in the Wright tractor.[35] The Court later clarified that the plaintiff could inquire only "whether there were any line separations on the tank on tractors of the model of the Wright case, whether there were line separations"—i.e., separations of the fuel line from the fuel tank.[36]

The plaintiff then argued that the manufacturer Husqvarna had knowledge of three fuel-

---

[31] (ECF No. 107 at 16.)
[32] (*Id.*)
[33] (Jan. 20, 2015 Trial Tr. at 399:12–400:4.)
[34] (*Id.* at 417:8–419:23.)
[35] (*Id.* at 419:13–491:18.)
[36] (*Id.* at 432:14–432:19.)

line separations in tractors with "the exact same fuel tank, same clamp, same line" on which he planned to cross-examine Mr. Brinkman.[37] The defense explained that the plaintiff was actually referring to a tractor with a fuel pump—which the Wright tractor did not have—and a clip on the fuel pump, which "has nothing to do with the gravity-fed tank" that was in the Wright mower."[38] In other words, the plaintiff was referring to the same Briggs & Stratton tractor model with the fuel pump that the magistrate judge had already correctly determined was not substantially similar to the Wright tractor, both in terms of its design as well as the issues it had that caused fuel leaks in those other tractors. Thus, the defense objected to the plaintiff's attempt to get "into mowers that are nothing like" the Wright mower.[39] The Court then instructed that parties that the "simple truth is we're talking about a specific tractor here and you ask the questions about that. I don't want to hear about all tractors, other tractors. I've had enough of that."[40]

Despite Magistrate Judge Miller's unequivocal ruling, despite never having that ruling overturned, and despite the Court's admonition to talk only about the "specific tractor here" and only ask whether "there were any line separations on the tank on tractors of the model of the Wright case," the plaintiff asked witness Brinkman to admit that Husqvarna "with this exact fuel tank, exact fuel line, exact fuel clamp, had had reports of at least three fuel line separations."[41] What the plaintiff was referring to, however, was precisely the evidence that Magistrate Judge Miller previously excluded. This was made plain when the plaintiff immediately thereafter attempted to show to the jury his exhibit 36 of a different tractor, to which the defense objected as being "excluded by prior order."[42] The Court initially indicated that it would not permit the

---

[37] (*Id.* at 433:1–433:12.)
[38] (*Id.* at 433:21–434:5.)
[39] (*Id.*)
[40] (*Id.* at 434:8–434:11.)
[41] (*Id.* at 453:16–453:20.)
[42] (*Id.* at 454:8–454:14.)

exhibit to be shown, based on the prior exclusion.[43] But the plaintiff persisted, telling the Court that the different tractor had "the exact same fuel tank, fuel line, fuel clamp"[44]—even though the plaintiff knew, as Magistrate Judge Miller had explained, that any issues involving fuel leaks with that tractor were *not* caused by separation of the fuel line from the fuel tank, but were instead caused by an entirely different issue related to a fuel-line-clip/tank abrasion issue associated with the routing of the fuel line to the fuel pump (which the Wright tractor did not have).

The defense objected several more times during the course of this questioning—which began with the plaintiff representing that there were "at least three fuel line separations" involving the Wright model tractor—including pointing out that what the plaintiff was asking the witness about and showing the jury was "a Briggs & Stratton engine, not a Kohler engine. So this is not the same tractor, and Judge Miller has ruled on this."[45] However, likely due to the intentional confusion that the plaintiff had created in attempting to circumvent Magistrate Judge Miller's ruling, the Court responded: "Let's just deal with what this Court is doing."[46] Finally, after talking about the dissimilar tractor with the Briggs & Stratton engine that was already ruled inadmissible, the plaintiff book-ended his improper line of questioning by asking Mr. Brinkman again "whether there were in fact three fuel line separations" with this fuel tank.[47]

The error the plaintiff caused was palpable. As Magistrate Judge Miller rightly determined, the Briggs & Stratton-engine model was materially different, involved fuel incidents caused by substantially different circumstances, and was entirely irrelevant and inadmissible. By ignoring that ruling and instead representing to the Court that those tractors involved the same

---

[43] (*Id.*)
[44] (*Id.* at 454:25–455:3.)
[45] (*Id.* at 457:21–457:25.)
[46] (*Id.*)
[47] (*Id.* at 458:1–460:15.)

issues that the plaintiff was alleging as his defect, the plaintiff violated that *in limine* order and induced the Court to dismiss the defense's concerns and to overrule its objections.

Through his improper questioning and the inferences it was intended to draw, the jury was led to believe that there were "reports of at least three other fuel line separations" with the Wright model tractor when, in fact, there were not—there was no such evidence. The plaintiff then used this improper evidence to argue in closing that "Mr. Brinkman didn't know anything about the other reports of leaks with this tank that was used on a different mower," and that Husqvarna "knew about fires."[48] This again referred to the dissimilar tractors with the Briggs & Stratton engines that had reports of fuel leaks related to clip abrasion entirely unrelated to the plaintiff's defect theory and was excluded under Magistrate Judge Miller's *in limine* ruling.

Alleged other incidents were a major theme of the plaintiff's case. And through his misconduct in violating the clear *in limine* ruling and inducing the Court to allow him to put before the jury irrelevant and unfairly prejudicial dissimilar incidents, the plaintiff obtained a verdict based on false evidence.[49] Allowing a verdict to stand on such grounds would be unfairly prejudicial and a miscarriage of justice.[50]

## II. The discovery sanctions of the "admission" combined with the exclusion of defense expert Dan Nielsen were unwarranted and disproportionate, resulting in material unfair prejudice by the introduction and reliance on the dissimilar Jeffersonville incident and what was tantamount to the striking of the defense, all while barring evidence to explain the lack of similarity.

The Court recounted its perception of the facts of the production of information concerning a reported incident in Jeffersonville, Indiana of a fire involving a similar tractor manufactured by the same manufacturer, Husqvarna.[51] The parties briefed that issue extensively,

---

[48] (Jan. 21, 2015 Trial Tr. at 709:4–709:12.)
[49] *See Gill*, 773 F.2d at 594.
[50] *Id.* ; *see also Van Eyl*, 468 F.3d at 429; *Park W. Galleries, Inc.*, 732 F. Supp. 2d at 750–51.
[51] (Mem. Op. (ECF No. 172).)

and the defense lodged a Rule 103 proffer and objection concerning the Court's imposition of the discovery sanction, the evidence the defense would have presented through their excluded expert as well as the evidence the defense would have elicited, if it had been permitted, to explain the details of the Jeffersonville, Indiana incident and to show its lack of similarity and irrelevance.[52] For what it found was a discovery violation, the Court struck defense expert Dan Nielsen and read to the jury an "admission" concerning the Jeffersonville incident—an "admission" with incomplete facts that led to an inference inconsistent with the full circumstances of that incident. Respectfully, the defense maintains that the discovery sanctions were in error.

The Fourth Circuit considers four factors in evaluating the propriety of a discovery sanction: (1) whether the non-complying party acted in bad faith, (2) the amount of prejudice that noncompliance caused the adversary, (3) the need for deterrence of the particular sort of non-compliance, and (4) whether less drastic sanctions would have been effective.[53] Sanctions under Rule 37 must be reasonable in light of the circumstances,[54] which requires that its "character and magnitude are proportionate to the character and magnitude of the violation of the underlying discovery order, and the harmful consequences of that violation."[55]

The Court based the discovery violation on the conclusion that there was a failure to timely disclose or supplement under Rule 37(c)(1), and applied a five-factor test covering "the exclusion of evidence that a party seeks to offer but has failed to disclose."[56] That five-factor test

---

[52] (*See* Pl.'s Mot. for Expedited Disc. Relief & Mem. in Supp. (ECF No. 133); Home Depot's Resp. to Pl.'s Mot. for Expedited Disc. Relief (ECF No. 136); Pl.'s Supp. Mem. in Supp. of Expedited Disc. Relief (ECF No. 138); Home Depot's Resp. to Pl.'s Supp'l Mem. in Supp. of Expedited Disc. Relief (ECF No. 140); Defs.' Rule 103(a) Written Offer of Proof (ECF No. 158).)

[53] *E.g., Belk v. Charlotte-Mecklenburg Bd. of Educ.*, 269 F.3d 305, 348 (4th Cir. 2001).

[54] 7 Moore's Fed. Practice § 37.50[1][a].

[55] *Id.* (citing *Crown Life Ins. Co. v. Craig*, 995 F.2d 1376, 1383 (7th Cir. 1993)).

[56] (ECF No. 172 at 2 (citing Fed. R. Civ. P. Rule 37(c)(1)); *id.* at 9 (following *S. States Rack & Fixture, Inc. v. Sherwin-Williams Co.*, 318 F.3d 592, 597 (4th Cir. 2003)).)

does not properly apply to these facts, and reliance on that test was in error. Moreover, the defense disclosed and supplemented with the Jeffersonville incident within a reasonable amount of time of learning of it, and the timing of the disclosure and supplement were substantially justified, as the defense explained.[57] Also, the Jeffersonville incident was not substantially similar to the Wright incident and was not properly admissible; the timing of its production was harmless.[58] In addition, Mr. Nielsen's deposition testimony wasn't false. He understood the questions to be asking him whether he was aware, at that time, of any other incidents, and since he did not at that time recollect any, he answered "no."[59] Thus, a finding of a sanctionable discovery violation and the imposition of sanctions were inappropriate, in the first place. But the sanctions were also improper under the appropriate four-part analysis.

First, there was no bad faith, which courts have defined to include "willful conduct," or where a party "'clearly should have understood [its] duty to the court' but nonetheless 'deliberately disregarded' it."[60] There was no evidence here of deliberate disregard or a "pattern of indifference and disrespect for orders of the Court and the Federal Rules of Civil Procedure,"[61] as courts have noted as supporting a finding of bad faith. In addition, the timing of the supplemental disclosure was justified, as explained in the January 9 and 13 hearings.[62]

Second, there was no prejudice. This was not, for example, a situation in which a party's refusals to comply with discovery requests prevented the opposing party from "defend[ing]

---

[57] *See* Fed. R. Civ. P. 26(e)(1)(A), 37(c)(1).

[58] *See id.*

[59] (Jan. 13, 2015 Tr. of Procs. at 51:21–53:18, 63:23–64:21.) The defense also objects to the conclusion that Mr. Nielsen was required to search his own files before his deposition.

[60] *Plant v. Merrifield Town Ctr. Ltd. P'ship*, No. 1:08cv374, 2009 WL 6082878, at *6 (E.D. Va. Dec. 23, 2009) (quoting *Rabb v. Amatex Corp.*, 769 F.2d 996, 1000 (4th Cir. 1985)).

[61] *Tolbert v. Charter Commc'n*, No. 6:10–cv–02618, 2012 WL 1340120, at *3 (D.S.C. Mar. 22, 2012).

[62] *See* Fed. R. Civ. P. 37(c)(1) (requiring a lack of substantial justification to impose a sanction).

against claims, facts, and witnesses."[63] The evidence concerning the Jeffersonville incident showed that it was *not* substantially similar to the Wright incident, including that the former involved a fire after the tractor was stored in a garage, as opposed to a fire occurring during operation.[64] Moreover, there was no evidence of any fuel-line separation in the Jeffersonville incident. Thus, it wasn't substantially similar or relevant and would never have been properly admissible.[65] There was no prejudice from the plaintiff not learning earlier about an irrelevant and inadmissible incident that should have done nothing to advance the plaintiff's case.

Third, there was no need for deterrence. There was no evidence that the defense "willfully and consistently stood in complete defiance of the Federal Rules" or that it "failed to comply in any way with" court orders.[66]

Fourth, less drastic sanctions were available and more appropriate, and the sanctions imposed were disproportionate. With respect, the "admission" on the Jeffersonville incident— which only after trial was explained as an admission under Rule 801—was incomplete and, as a result, inaccurate. It had the drastic effect of causing the jury to believe that *the defense admitted* that the cause of the Jeffersonville fire was a fuel-line separation, when the totality of the facts discovered during the investigation showed something very different. Combined with the plaintiff's repeated references to it,[67] the "admission" turned what was an irrelevant, inadmissible other incident into the plaintiff's "smoking gun" and the linchpin of his case. That undue prejudice was compounded by the Court precluding the defense from countering or explaining the "admission" and the Jeffersonville incident—even when the plaintiff had opened

---

[63] *United States v. One Tract of Real Prop.*, No. 95–1282, 1997 WL 71719, at *3 (4th Cir. Feb. 20, 1997).
[64] (Jan. 20, 2015 Trial Tr. at 465:7–465:18.)
[65] *Ford Motor Co. v. Phelps*, 239 Va. 272, 276, 389 S.E.2d 454, 457 (1990).
[66] *Plant*, 2009 WL 6082878, at *6.
[67] (*E.g.*, Jan. 14, 2015 Trial Tr. at 57:15–58:12, 63:16–18; Jan. 15, 2015 Trial Tr. at 209:12–210:16; Jan. 20, 2015 Trial Tr. at 465:7–25; Jan. 21, Trial Tr. at 673:13–673:19, 709:11–709:12.)

doors[68]—which, in effect, appeared to support the plaintiff's theory that the defendants had notice of a purportedly similar incident and should have warned or taken other action. The drastic nature of this sanction and its effect—as well as the uses to which the plaintiff put it—were significantly out of proportion to the severity of the perceived harm from the late disclosure of this irrelevant and dissimilar incident, which was non-existent.

Striking defense expert Mr. Nielsen was also drastic and overly severe, as it had the effect of striking the defense's case as to the design-defect theories and crippling the defense's ability to defend the product itself—a point that the plaintiff seized on in closing by arguing that the defense never brought anyone to defend this tractor's design or to counter Mr. Christoffersen.[69] The sanction of excluding him entirely also lacked any nexus to the perceived violation, and, with respect, the Court's ruling doesn't show such a nexus.[70]

As for Mr. Nielsen, one alternative could have been to allow cross-examination as to the Mr. Nielsen's testimony about the Jeffersonville incident, and to let the jury determine if his testimony was "false" and, if so, what weight that issue deserved in evaluating his testimony as a whole. Another less drastic and severe sanction would have been to grant a continuance for the plaintiff to conduct limited discovery on the Jeffersonville incident.[71] The plaintiff opposed a continuance because it supposedly would have presented a "horrible position" of "having justice delayed."[72] Only a few months earlier, however, the plaintiff asked for a continuance to conduct

---

[68] (*E.g.*, Jan. 15, 2015 Trial Tr. at 215:5–216:15 (Brown); Jan. 20, 2015 Trial Tr. at 465:7–466:3 (Brinkman).)

[69] (Jan. 21, 2015 Trial Tr. at 677:18–678:1.)

[70] (*See* Mem. Op. (ECF No. 172) at 10.)

[71] *Wilson v. Volkswagen of Am., Inc.*, 561 F.2d 494, 504 (4th Cir. 1977) ("Even . . . where it may be found that failure to produce results in the discovering party's case being jeopardized or prejudiced, it is the normal rule that the proper sanction must be no more severe than is necessary to prevent prejudice to the movant." (citation and internal quotation marks omitted)).

[72] (Jan. 9, 2015 Tr. of Procs. at 8:11–8:20.)

additional discovery,[73] with no mention of delayed justice. The plaintiff's "justice delayed" argument also rings hollow considering that he waited until just before the statute of limitations expired to file and months longer to serve the defendants. He purposefully didn't name the actual manufacturer and instead named numerous uninvolved entities (complicating discovery, needlessly compounding the litigation, and increasing costs). The case had been litigated for over two years; a short continuance—or an in-trial deposition—would have caused no prejudice.

Respectfully, the Court's sanction was unwarranted, in the first place, and disproportionate under the circumstances. The finding of a sanctionable discovery violation and the imposition of such drastic sanctions warrants a new trial.

### III. The striking of Mr. Wright's mental and physical impairments as well as improper tractor maintenance as bases for a contributory-negligence defense was in error, which was compounded the jury instruction finding such evidence insufficient.

Under Virginia law, contributory negligence exists when "a plaintiff fails to act as a reasonable person would have acted for his own safety under the circumstances."[74] "As a general rule, contributory negligence is a jury issue,"[75] unless reasonable minds could not differ on the issue.[76] Moreover, the defendant "is entitled to a contributory negligence instruction" on any issue for which there is "any evidence to support that theory."[77] In addition, the Fourth Circuit has explained, because damages and contributory negligence are also so interwoven, it "would be rare" to submit the case to the jury on the question of damages without allowing in evidence relating to the plaintiff's conduct around the time of the accident.[78]

---

[73] (Pl.'s Mot to Continue & Mem. in Support (ECF Nos. 25, 26); *also* Aug. 1, 2014 Tr. of Procs. (ECF No. 184-1) at 22:13–22:24.)

[74] *Artrip v. E.E. Berry Equip. Co.*, 240 Va. 354, 397 S.E.2d 821, 824 (Va. 1990).

[75] *Va. Elec. & Power Co. v. Winesett,* 225 Va. 459, 303 S.E.2d 868, 872 (1983).

[76] *Artrip*, 240 Va. at 358, 397 S.E.2d at 823; *Kelly v. Va. Elec. & Power Co.*, 238 Va. 32, 381 S.E.2d 219, 222 (Va. 1989).

[77] *Sloas v. CSX Transp. Inc.*, 616 F.3d 380, 392 (4th Cir. 2010).

[78] *Id.* (citing *Norfolk S. R.R. Co. v. Ferebee*, 238 U.S. 269, 273 (1915)).

The evidence showed that a proximate cause of Mr. Wright's death was contributory negligence in multiple respects: 1) his plowing leaves, contrary to the express warnings and instructions in the tractor's operator's manual; 2) his failure to account for his significant physical and mental impairments, as specifically warned about in the operator's manual,[79] and 3) his failure to properly clean and maintain the tractor in terms of the mower's blade and the accumulation of leaf materials and debris on the mower deck, again contrary to the warnings. The Court allowed the jury to consider the first basis,[80] but it granted the plaintiff's oral motion to strike the latter two theories as bases for contributory negligence.[81]

In addition, over objection and in deviation from the model instruction,[82] the Court also instructed the jury that there was insufficient evidence to support contributory negligence based on improper maintenance and Mr. Wright's physical and mental infirmities.[83] The striking of contributory negligence based on Mr. Wright's physical and mental infirmities and improper tractor maintenance, along with the jury instruction, were in error,[84] since viewed in the light more favorable to the defense, there was sufficient record evidence to support those theories.

There was abundant evidence that Mr. Wright's physical and mental infirmities were such that, as the tractor's operator's manual warned, he did not exercise due care for his safety when he failed to evaluate his ability to operate this machinery or the risks associated with his use of the tractor. As the Court instructed the jury, "negligence is the failure to act as a

---

[79] (*E.g.*, Jan. 21, 2015 Trial Tr. at 652:16–654:22.)

[80] (Jan. 21, 2015 Trial Tr. at 654:23–656:17).

[81] (*Id.*)

[82] (Jan. 21, 2015 Trial Tr. at 666:12 – 667:12, 669:17–669:23.)

[83] (Jan. 21, 2015 Trial Tr. at 666:12–667:12, 728:6–728:20.)

[84] *See* 12 Moore's Fed. Practice § 59.13[2][b][i][B] ("A new trial may be properly granted when the judge issues incorrect jury instructions, or fails to give a properly requested jury instruction, that would taint the deliberation process.").

reasonable person would have acted for his own safety under the circumstances."[85] There was abundant record evidence that Mr. Wright suffered from numerous mental and physical impairments—impairments that impeded his ability to walk, to feel his legs, to recall, to appreciate his surroundings.[86] He had dementia, neuropathy, motor deficits, plantar flexion, numbness, heart disease, diabetes, had suffered multiple heart attacks and had recently been hospitalized for an infection, and had been using a wheelchair.[87] His wife testified that she knew he was infirm, that she tried to get him off the tractor that day, and that he had problems with his legs and would fall at times.[88] Indeed, Magistrate Judge Miller called this a "very, very, very compelling case for contributory negligence" based on "Mr. Wright's physical condition" and "his ability to exit the lawn mower when this fire did happen."[89] As the defense argued,[90] and as the law provides, this was a jury issue.[91] The defense was entitled to have the jury consider all of this evidence and draw its own inferences about whether Mr. Wright should have been on the tractor. Nonetheless, the Court barred the contributory-negligence defense on this basis.

The reasons cited don't support barring this theory. The Court explained that it recalled "that Dr. Pontier testified that in October the defendant's dementia was apparently under control."[92] But that was not the evidence. Dr. Pontier testified only that in October, as documented in multiple entries in his medical history, Mr. Wright's dementia was "improved"— Dr. Pontier did not testify that Mr. Wright was no longer suffering from dementia.[93] The jury

---

[85] (Jan. 21, 2015 Trial Tr. at 728:6–728:9); *see also Artrip*, 240 Va. 354, 397 S.E.2d at 824.
[86] (Jan. 20, 2015 Trial Tr. at 495:23–496:9, 496:16–497:11.)
[87] (Jan. 20, 2015 Trial Tr. at 495:23–502:25.)
[88] (Nov. 19, 2013 Dep. of A. Wright (Ex. A) at 22:7–23:12, 40:3–40:15, 47:18–48:16, 49:12–16.)
[89] (No. 24, 2014 Tr. of Procs. at 52:9–53:10.)
[90] (Jan. 21, 2015 Trial Tr. at 658:25–659:5.)
[91] *See Winesett,* 225 Va. 459, 303 S.E.2d at 872.
[92] (Jan. 21, 2015 Trial Tr. at 655:16–655:17.)
[93] (Jan. 20, 2015 Trial Tr. at 524:7–524:18.)

was entitled to weigh all the evidence to determine whether someone with "improved" dementia—along with all Mr. Wright's other ailments—should have been on the tractor, and whether his using gas-powered machinery despite his serious medical conditions was reasonable.

The second basis the Court offered was its finding that Mr. Wright "was able to ambulate by his—by his walker to get on the tractor and operated the tractor for some time before this accident took place."[94] But this was the Court weighing the evidence, which is properly the jury's role. The jury was entitled to weigh all the evidence—including that Mr. Wright needed a walker just to get to the tractor—to determine whether he should have been riding the tractor at all. They were also entitled to consider other evidence, such as that Mr. Wright was no longer able to drive a car and had to receive further evaluation to determine if he could even use a motorized scooter because of his physical and mental infirmities, to decide whether he acted reasonably in operating his tractor that day. And the jury was entitled to consider whether it was reasonable, in light of the warnings provided concerning possible fire hazards and other dangers of using a gas-powered piece of machinery, for someone with significant physical and cognitive impairments to put himself on such a piece of equipment in the event there was a fire, given how his impairments would have impeded his ability both to perceive a danger and to extricate himself safely, as Magistrate Judge Miller noted.

As for the second theory, defense expert Neil Wu explained that one possible cause of this fire was leaves and debris that accumulated on the mower deck—about which the tractor's operator's manual warned.[95] The Court acknowledged evidence of "two inches accumulated, according to Mr. Wu, under the lawnmower," and stated that such evidence "does in and of itself establish that that was misuse of the lawnmower" but noted that "Mr. Wu could not testify how

---

[94] (Jan. 21, 2015 Trial Tr. at 655:18–655:20.)

[95] (Jan. 20, 2015 Trial Tr. at 556:25–557:13, 559:12–25, 560:15–561:5; Trial Ex. 16 (Operator's Manual) at 2 (Ex. B); *see also* Jan. 21, 2015 Trial Tr. at 653:10–653:16.)

long those leaves had been on that lawn mower or how they got there."[96] It is unclear what relevance the length of time the leaves were there or how they got there had with respect to the issue of improper maintenance. Those issues, to the extent they were relevant at all, were something the plaintiff could have explored in cross-examination and the jury could have weighed in its deliberations. Those issues did not, however, justify striking the defense theory.

The contributory-negligence jury instruction compounded and exacerbated this error. Jury instructions must be both accurate and fair.[97] But where, as here, the jury is instructed in accordance with an erroneous evidentiary ruling, the instruction compounds the error.[98] And that error was further exacerbated by the plaintiff, in his closing, emphasizing the striking of the contributory-negligence defenses, further prejudicing the defense.[99]

An improper jury instruction is reviewed for prejudice "based on a review of the record as a whole."[100] Thus, as was the case here, an error repeated several times throughout the proceedings—including in the jury instructions—will have a greater prejudicial effect.[101] Ryobi Technologies is therefore entitled to a new trial—one at which the jury may consider all the proper bases for contributory negligence, including Mr. Wright's physical and mental infirmities and improper tractor maintenance.

IV. **The exclusion of material, relevant evidence—namely, the tractor's compliance with industry standards and Mr. Wright's medical records—and the introduction of irrelevant evidence—compensation that the defense expert's company received from an unrelated entity—were in error and unfairly prejudiced the defense.**

A court must set aside a verdict and grant a new trial if it believes the verdict will result

---

[96] (Jan. 21, 2015 Trial Tr. at 655:6–655:10.)
[97] *United States v. Smoot*, 690 F.3d 215, 223 (4th Cir. 2012).
[98] *See United States v. Harris*, 27 F.3d 111, 114 (4th Cir. 1994).
[99] (Jan. 21, 2015 Trial Tr. at 682:17–684:1.)
[100] *Figg v. Schroeder*, 312 F.3d 625, 640 (4th Cir. 2002).
[101] *See Harris*, 27 F.3d at 114.

in a miscarriage of justice,[102] including because of the improper admission or exclusion of evidence, "particularly when the evidence improperly admitted is found to be prejudicial."[103] Excluded evidence supports a new trial when it prevents a party "from fully developing evidence relevant to a material issue."[104] Here, the trial court improperly excluded material, relevant evidence from the defense's case, while allowing irrelevant and unfairly prejudicial evidence from the plaintiff—both of which the plaintiff exploited to unfairly prejudice the defense.

First, witness Steve Brinkman testified that the Wright tractor complied with the relevant industry standards, ANSI B71.1, and the defense attempted to admit documents corroborating that compliance.[105] The Court refused that evidence because it felt the evidence "just bolsters" Mr. Brinkman's testimony.[106] Compliance certification materials, such as those the defense offered but were refused, are routinely admitted as material evidence where a product is governed by governmental or industry standards.[107] Moreover, compliance with industry standards was a key issue, given its prominence in determining the reasonableness of a product's design and allegations of defect and unreasonable danger.[108] Indeed, the Court instructed the jury on this issue, and that they could consider "evidence of compliance or noncompliance with industry standards."[109] Excluding the compliance exhibits and holding the defense only to Mr. Brinkman's oral testimony unfairly and improperly limited its evidence on this critical issue.

The impact of that error was compounded when the plaintiff seized on the Court's ruling

---

[102] *Gill*, 773 F.2d at 594.

[103] 12 Moore's Fed. Practice § 59.13[2][b][i][E].

[104] *Schultz v. Butcher*, 24 F.3d 626, 632 (4th Cir. 1994).

[105] (Jan. 20, 2015 Trial Tr. at 477:24–480:5; *see also id.* at Def. Trial Exs. 18 & 19 (ANSI B71.1-2003, 4/7/05 & 9/2/05: Marked & Refused) (Ex. C).)

[106] (Jan. 20, 2015 Trial Tr. at 479:16–479:21.)

[107] *See, e.g., Holmes v. Wing Enters., Inc.*, No. CIV.A. 1:08-CV-822, 2009 WL 1809985, at *8 (E.D. Va. June 23, 2009).

[108] *Alevromagiros v. Hechinger Co.*, 993 F.2d 417, 420 (4th Cir. 1993).

[109] (Jan. 21, 2015 Trial Tr. at 730:25–731:5.)

to argue in closing that the "manufacturer's corporate representative [Mr. Brinkman] came up here and said, We tested it to ANSI, but they are minimum standards. Where are the tests? Where are the tests? These companies got reams of documents all over the place. Just the man saying it; because I say so."[110] The clear implication is that Mr. Brinkman was lying, and that the tractor didn't comply with ANSI, when the compliance certification materials would have shown the jury that it did, precluding the plaintiff's baseless argument and criticism. In other words, the Court excluded the compliance documents because they would have "bolstered" Mr. Brinkman's testimony, and then the plaintiff criticized the defense because it didn't produce any documents to bolster Mr. Brinkman's testimony—a classic double whammy. The exclusion of the compliance exhibits was prejudicial error, with the prejudice compounded by the plaintiff's ability to argue that the absence of supporting evidence.

Similarly, the defense attempted to admit relevant medical records of Dr. Pontier detailing Mr. Wright's treatment history, defense exhibit 31B, citing Federal Rules of Evidence 803(4) and 803(6), as well as case law supporting their admission.[111] The Court ruled, however, that Dr. Pointier could review his records of Mr. Wright's treatment, but that the records themselves would not be admitted. This was error. Medical records from Dr. Pointer concerning Mr. Wright's treatment history were relevant to central issues in the case, including whether Mr. Wright's exercise of due care for his own safety given his ongoing physical and mental disabilities, and were properly admissible under two separate exceptions to the hearsay rule.[112]

First, these records are admissible under Rule 803(4), which provides a hearsay exception for statements that (a) are made for or pertinent to medical treatment or diagnoses; and (b)

---

[110] (Jan. 21, 2015 Trial Tr. at 693:21–694:2.)

[111] (Jan. 20, 2015 Trial Tr. at 493:19–494:17.)

[112] *See Hutcherson v. Lim*, No. RWT 8-CV-3044, 2013 WL 1482861, at *2 (D. Md. Apr. 9, 2013), *aff'd*, 584 F. App'x 151 (4th Cir. 2014).

describe medical history, "past or present symptoms," "their inception," "or their general cause."[113] Records are admissible under this exception if (1) the declarant's motives in making statements contained in the records are "consistent with the purposes of promoting treatment"; and, (2) the content is the type "reasonably relied on by a physician in treatment or diagnosis."[114] Here, Dr. Pointer's records of Mr. Wright's diagnoses and treatment were admissible, as they were created with the diagnoses and treatment of Mr. Wright's medical conditions in mind and not under the specter of any litigation.[115]

Second, Dr. Pointer's records were also properly admissible under the business-records exception;[116] in fact, records kept by doctors "often fit the [Rule 803(6)] exception and are routinely admitted."[117] Dr. Pontier's records met all five requirements for this exception,[118] namely: (1) they were created by Dr. Pointer and made at or near the time of treatment or diagnosis by someone with knowledge; (2) they were kept by his office as part of their routinely conducted business—diagnosis and treatment of patients; (3) this record keeping is a regular practice for Dr. Pointer's office; (4) Dr. Pointer was ready to testify as to these practices; and (5) nothing about these records indicates a lack of trustworthiness. Because these records were relevant for several reasons—including Mr. Wright's ability to use the tractor, his adherence to warnings, and other defenses, and the issue of damages—and are not inadmissible hearsay, the Court erred in excluding them. This error prejudiced Ryobi Technologies by cutting short its ability to fully present its case, in that the jury was entitled to review these records along with the

---

[113] Fed. R. Evid. 803(4).
[114] *Willingham v. Crooke*, 412 F.3d 553, 562 (4th Cir. 2005).
[115] (Jan. 20, 2015 Trial Tr. at 488:12–19, 489:7–18.)
[116] *See* Fed. R. Evid. 803(6).
[117] *Doali-Miller v. SuperValu, Inc.*, 855 F. Supp. 2d 510, 517 (D. Md. 2012).
[118] *Id.* at 516–17.

other evidence concerning Mr. Wright's physical and mental infirmities.[119]

While the defense was barred from admitting relevant, material evidence, thereby prejudicing its case, the plaintiff was allowed to introduce entirely irrelevant evidence. For example, during his cross-examination of defense expert Neil Wu, the plaintiff asked him whether he was aware "that over a 10-year period that Ford Motor Company alone has paid your company $79 million for expert consulting work."[120] The defense rightly objected on relevance, given that Mr. Wu had never done any work for Ford.[121] The Court nonetheless allowed the cross-examination, concluding that it went to "general impeachment."[122] The plaintiff built on that improper cross-examination to support his "David versus Goliath" theme in closing, arguing about how it doesn't matter "how much money you spend on high-priced experts."[123]

The cross-examination with the amounts that an automobile manufacturer paid Mr. Wu's employer, beginning before he joined the company, was irrelevant, improper impeachment, and highly prejudicial. Evidence concerning fees paid to Mr. Wu in this case was relevant. Evidence concerning amounts paid by someone else in connection with other cases and other work, over a decade-long period, has no relevance and instead only opened "the door to misleading information and juror confusion," as other courts have determined in similar situations.[124]

Other courts have also recognized the non-existent value of "disclosure of the expert's gross compensation," as it provides "the jury with little information relevant to a fair assessment of the expert's credibility, while concomitantly introducing the real possibility of creating

---

[119] *See Schultz*, 24 F.3d at 632.
[120] (Jan. 20, 2015 Trial Tr. at 582:6–585:3.)
[121] (*Id.*)
[122] (*Id.*)
[123] (Jan. 21, 2015 Trial Tr. at 682:3–7.)
[124] *See, e.g.*, *McCracken v. DePuy Orthopaedics, Inc.*, No. 1:11-dp-20485-DAK, ECF No. 69 (N.D. Ohio July 26, 2013).

confusion, distraction and even prejudice."[125] The evidence the plaintiff introduced here was even more irrelevant and prejudicial in that it was not even Mr. Wu's gross compensation—it was compensation paid to his employer, beginning before he joined the company. Allowing such irrelevant information put the defense in a Catch-22 of either allowing the misleading and prejudicial gross compensation figure to go unanswered, or drawing more attention to it by providing the proper context and explaining the lack of relevance to Mr. Wu and this case.

The errors noted above individually warrant a new trial. Combined, they compel one.

**V.    The plaintiff's counsel's misconduct in closing—including calling the defense liars, invoking xenophobia, and asking the jury to "send a message"—prejudiced and improperly influenced the jury and tainted their verdict, requiring a new trial.**

Attorney misconduct warrants a new trial where there is a "reasonable probability" that the conduct improperly influenced the jury in reaching its verdict[126] including by subverting "the jury's reason or . . . its commitment to decide the issues on the evidence received and the law as given by the trial court."[127] Moreover, conduct or remarks by counsel that "raise questions in the minds of the jurors as to the character of opposing counsel or an opposing party without any evidence to support the inferences may be grounds for a new trial if a party has been prejudiced."[128] In evaluating whether the misconduct warrants a new trial, the Court must consider the "'totality of the circumstances, including the nature of the comments, their frequency, their possible relevancy to the real issues before the jury, the manner in which the parties and the court treated the comments, the strength of the case (e.g. whether it is a close case), and the verdict itself.'"[129]

Here, there was repeated misconduct throughout the plaintiff's closing, improperly

---

[125] *Behler v. Hanlon*, 199 F.R.D. 553, 561–62 (D. Md. 2001).
[126] 12 Moore's Fed. Practice § 59.13[1] § 59.13[2][c][i][B].
[127] *Arnold v. E. Air Lines, Inc.*, 681 F.2d 186, 195, 197 (4th Cir. 1982).
[128] 12 Moore's Fed. Practice § 59.13[2][c][i][B].
[129] 681 F.2d at 197.

influencing the jury. Virtually the entirety of his closing was a "send a message" argument[130] that federal courts have condemned.[131] The defense objected to these arguments, but the Court overruled the first objection[132]—signaling to the jury that this argument was appropriate—before finally sustaining an objection during the plaintiff's rebuttal closing.[133]

The impropriety of the plaintiff's closing and his counsel's misconduct went far beyond merely "send a message." Counsel waited until his rebuttal closing—when the defense would not have a chance to respond—to call the defense liars.[134] And he argued that the jury should award damages based on alleged and unproven harm to others—an argument that would be improper even in a punitive-damages context.[135] These improper rebuttal arguments also drew objections—including a *sua sponte* objection from the Court itself—which were sustained.

Still, there was more. The plaintiff's counsel compounded the prejudice from his improper "send a message" theme by arguing in his rebuttal closing—without any evidence in the record—about "Ryobi in Japan, the one at the top is Ryobi in Tokyo."[136] There is zero evidence whatsoever in this trial record of "Ryobi in Japan." Ryobi Technologies was—before its dissolution—based in South Carolina.[137] Nonetheless, the plaintiff misstated the facts to have the jury incorrectly think that Ryobi Technologies was a Japanese company, and that jury needed to send a message with a verdict so big that it would be heard all the way back in Japan. This inflammatory and xenophobic rhetoric could have no purpose but to inflame passions and

---

[130] (Jan. 21, 2015 Trial Tr. at 689:14–689:23.)
[131] *United States v. Runyon*, 707 F.3d 475, 514 (4th Cir. 2013); *Neal v. Toyota Motor Corp.*, 823 F. Supp. 939, 943 (N.D. Ga. 1993).
[132] (Jan. 21, 2015 Trial Tr. at 689:14–689:23.)
[133] (Jan. 21, 2015 Trial Tr. at 713:8–713:18.)
[134] (*Id.* at 708:11–708:14.)
[135] (*Id.* at 713:8–713:18); *see Philip Morris USA v. Williams*, 549 U.S. 346, 353 (2007).
[136] (*Id.* at 710:23–710:24.)
[137] (*See* Answer, Ryobi Techs. at ¶¶ 16–17 (ECF No. 9).)

prejudice the defense.[138] Indeed, the plaintiff's counsel built on this xenophobic theme, arguing that the defense arguments didn't reflect "American values" or "Virginia values."[139] This argument was entirely improper.

The improper conduct during closing got so bad that the Court finally told the plaintiff's counsel to "just plain terminate" his closing.[140] Once he did, in addition to its earlier objections, the defense moved for a mistrial, which was the only appropriate remedy in light of the severity of the misconduct and prejudice.[141] The Court denied that motion.[142]

Considering the totality of the circumstances, the misconduct in the plaintiff's closing requires a new trial. His comments were not only improper, inflammatory, and prejudicial, and they were frequent and repeated, yet lacking any "possible relevancy to the real issues before the jury."[143] Indeed, the Court had to continually prompt the plaintiff's counsel to "get back to the substance of" his argument[144] before finally cutting his closing short.[145] The misconduct was so flagrant that the Court objected on its own and admonished the plaintiff's counsel (outside the presence of the jury).[146] In light of the lack of evidence to support his claim in the first place—especially against Ryobi Technologies, which had nothing to do with this tractor—the only reasonable conclusion is that the plaintiff's counsel's misconduct with his inflammatory closing improperly influenced the jury and prejudiced the defense.[147]

The fact that such flagrant misconduct took place in a short period of time doesn't

---

[138] *Cf. Neal*, 823 F. Supp. at 943 (finding that attempts "to incite the jury into a xenophobic rage," along with other improprieties, would warrant a new trial).
[139] (Jan. 21, 2015 Trial Tr. at 681:21–682:2.)
[140] (*Id.* at 713:19.)
[141] (*Id.* at 714:25–715:20.)
[142] (*Id.*)
[143] *Cf. Arnold*, 681 F.2d at 197.
[144] (Jan. 21, 2015 Trial Tr. at 689:24–689:25.)
[145] (*Id.* at 713:19.)
[146] (Id. at 716:4–716:8.)
[147] *Cf. Arnold*, 681 F.2d at 197.

ameliorate its severity, diminish the prejudice, or undermine the need for a new trial. The trial lasted less than four days from empaneling the jury to the start of deliberation. The concentrated outburst of improper conduct in the plaintiff's closing replaced the evidence that the jury heard in that short time with inflammatory rhetoric. Such misconduct warrants a new trial.

**VI.     Because the jury's award of $2.5 million is excessive, the Court should grant a new trial outright—or, in the alternative, a new trial conditioned on the plaintiff's refusal to accept a remitted damages award.**

A motion for a new trial on the issue of excessive damages is "governed by Rule 59(a)" and "will be granted when the amount of the verdict is so unreasonable as to be entirely disproportionate to the plaintiff's injury."[148] Whether the verdict exceeds the allowable limit on damages is a question of law.[149] When ruling on a motion for a new trial on the ground of excessiveness, the Court should use its "independent judgment, after weighing all the evidence and other relevant factors, to determine whether the verdict is against the clear weight of the evidence or otherwise results in a miscarriage of justice."[150] If the verdict is "excessive because it is not supported by the evidence," the Court can overturn it and "order a new trial outright," or condition a new trial "on the verdict winner's refusal to accept a 'remittitur.'"[151]

In this diversity action, Virginia law governs this issue[152] and compels setting aside a verdict "if the amount awarded is so great as to shock the conscience of the court and create the impression that the jury has been motivated by passion, corruption, or prejudice," or if the jury "has misconceived or misconstrued the facts or the law, or if the award is so out of proportion to

---

[148] 12 Moore's Fed. Practice § 59.13[2][g][i]; *see also Cline*, 144 F.3d at 305.

[149] 12 Moore's Fed. Practice § 59.13[2][g][i].

[150] 12 Moore's Fed. Practice § 59.13[2][g][iii][A]; *see also Williams v. Nichols*, 266 F.2d. 389, 391–93 (4th Cir. 1959) (holding that the "light most favorable" standard is not applicable to a motion for new trial).

[151] 12 Moore's Fed. Practice § 59.13[2][g][iii][A]; *Cline*, 144 F.3d at 305–06.

[152] *Stamathis v. Flying J, Inc.,* 389 F.3d 429, 438 (4th Cir. 2004).

the injuries suffered as to suggest that it is not the product of a fair and impartial decision."[153] Here, the $2.5 million damages award is excessive and compels a new trial.

First, a $2.5 million wrongful death award—in the absence of evidence of economic damages—is far higher than any award the defense has been able to locate in Virginia under comparable facts, and is out of proportion to the injuries. At the time of his death, Mr. Wright was 88 years old,[154] with a 4.9-year life expectancy.[155] That works out to a compensatory damages award of over $510,000 per year for his remaining life expectancy, which is far higher than comparable verdicts. For example, the award in *Shepard v. Capitol Foundry of Va., Inc.,* of $1.1 million to the 83-year-old widower[156] of a 67-year-old wrongful death decedent—based on the widower's life expectancy—worked out to less than $167,000 per year, or less than one-third of the annualized award here.

Where there have been comparable awards in amount only, the plaintiff's decedent was significantly younger, or were otherwise factually distinguishable. For example, in *Bristow v. John Crane, Inc.*, an asbestos case which resulted in a $2.25 million award to a wrongful-death widow for sorrow, mental anguish, solace, loss of services, protection, care, and assistance, the decedent was 68 years old when he died,[157] with a remaining life expectancy of 14.7 years.[158] That works out to an annualized award of just over $153,000 per year—roughly comparable to the award in *Shepard,* and far below the jury's award here. And that is before taking into account

---

[153] *Bennett v. R & L Carriers Shared Servs., LLC*, 492 F. App'x 315, 334 (4th Cir. 2012) (quoting *Shepard v. Capitol Foundry of Va., Inc.,* 262 Va. 715, 554 S.E.2d 72, 75 (2001)) (unpublished); *see also* 12 Moore's Fed. Practice § 59.13[2][g][i].
[154] (Jan. 21, 2015 Trial Tr. at 648:18–648:19.)
[155] Va. Code Ann. § 8.01-419.
[156] *Shepard,* 262 Va. at 722, 554 S.E.2d at 76.
[157] No. CL1-0972, 2012 WL 1851913 (Va. Cir. Ct. 2012).
[158] Va. Code Ann. § 8.01-419.

the totality of Mr. Wright's overall health and condition.[159]

Second, the excessive amount of the verdict supports that the jury was improperly motivated by passion or prejudice. Improper appeals to passion and prejudice were the plaintiff's central themes for his inflammatory closing—one for which the Court admonished the plaintiff's counsel (outside the presence of the jury):

> Mr. Sullivan, I don't know where you practice; in Kansas City? But in this jurisdiction we don't call people liars in closing argument. I want you to understand that. Next time you come in this jurisdiction, you get a briefing on the proper scope of closing argument.[160]

This was not counsel's first warning against attacking opposing counsel in this fashion in Virginia,[161] which further supports the deliberate nature of this inflammatory rhetoric.

The plaintiff's counsel indeed called the defense liars.[162] His closing teemed with even more improper, unsupported, inflammatory argument, including misplaced appeals to xenophobia.[163] This improper and inflammatory rhetoric was designed purely to inflame passion and prejudice.[164] And it clearly resonated with the jury, as evidenced by their excessive award.

Third, this excessive verdict was likely affected by the admission of false evidence

---

[159] *E.g.*, Va. Code Ann. § 8.01-419 (supporting the propriety of the fact finder taking the decedent's age and life expectancy into account, along with other evidence of health and constitution, in determining damages). In light of his age and health, the jury's award is all the more outside the bounds of reason.

[160] (Jan. 21, 2015 Trial Tr. at 716:4–716:8.)

[161] *See Buchanan v. Ford Motor Co.*, No. 770CL10000179 (Roanoke Cir. Ct. Sept. 8, 2011), Hr'g Tr. at 52:8–52:15 (Ex. D) ("THE COURT: Let me caution you, Mr. Sullivan. I typically— while I can respect and appreciate the statement that something is not true, it frankly borders on and rings a bit like attacking opposing counsel. And we just typically don't do that in Virginia. At least not in Southwest Virginia. At least not in the 23rd Circuit.")

[162] (*Id.* at 708:11–708:14.)

[163] *See infra* Part V.

[164] *Cf. Neal v. Toyota Motor Corp.*, 823 F. Supp. 939, 943 (N.D. Ga. 1993) (finding that attempts "to incite the jury into a xenophobic rage," along with other grounds, would warrant a new trial).

concerning other incidents that were materially dissimilar to the incident at issue here.[165] The plaintiff's improper and factually unsupported references to "at least three fuel line separations" with "this exact fuel tank, exact fuel line, exact fuel clamp" likely misled the jury.[166] Combined with the improper "send a message" rhetoric, this evidence concerning other incidents that were made to appear similar or related likely prejudiced the jury to wrongly believe that the Wright tractor design had a history of fuel-line separations, when they didn't.

The Court should overturn the jury's verdict outright based on its excessiveness and order a new trial.[167] Alternatively, the Court should order a new trial conditioned on the plaintiff's refusal to accept a remitted amount falling within the range of reasonableness, in light of all the evidence and relevant factors.[168]

## Conclusion

Due in large part to the plaintiff's improper and unsupported assertions and arguments, the trial was rife with numerous instances of error that materially prejudiced the defense. The Court should grant judgment as a matter of law for Ryobi Technologies, for the reasons stated in that motion. But even if it does not, the Court should nonetheless rule on this motion and grant a new trial as to Ryobi Technologies only, for all the foregoing reasons.

RYOBI TECHNOLOGIES, INC.,

By Counsel

*/s/ Robert L. Wise*

Robert L. Wise (VSB No. 42030)
BOWMAN AND BROOKE LLP
901 East Byrd Street, Suite 1650

---

[165] *See supra* Part I.
[166] (Jan. 20, 2015 Trial Tr. at 453:16–453:20; Jan. 21, 2015 Trial Tr. at 709:4–709:12.)
[167] *See Cline*, 144 F.3d at 305–06.
[168] *See id.*

Richmond, VA 23219-4027
Telephone: (804) 649-8200
Facsimile: (804) 649-1762
Email: rob.wise@bowmanandbrooke.com

John R. Owen (VSB No. 39560)
Julie S. Palmer (VSB No. 65800)
Dannel C. Duddy (VSB No. 72906)
HARMAN, CLAYTOR, CORRIGAN & WELLMAN
P.O. Box 70280
Richmond, VA 23255
Telephone: (804) 747-5200
Facsimile: (804) 747-6085
Email: jowen@hccw.com
        jpalmer@hccw.com
        dduddy@hccw.com

Frederick W. Bode, III (admitted *pro hac vice*)
Douglas M. Grimsley (VSB No. 70099)
DICKIE, MCCAMEY & CHILCOTE, P.C.
Two PPG Place, Suite 400
Pittsburgh, PA 15222-5402
Telephone: (412) 392-5418
Facsimile: (888) 811-7144
Email: rbode@dmclaw.com
        dgrimsley@dmclaw.com

*Counsel for Ryobi Technologies, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on the 20th day of February, 2015, I filed the foregoing via CM/ECF

which will send a Notice of Electronic Filing (NEF) to the following:

Richard N. Shapiro, Esquire
James C. Lewis, Esquire
SHAPIRO LEWIS APPLETON & DUFFAN, P.C.
1294 Diamond Springs Road
Virginia Beach, VA 3455
*RShapiro@injurylaw.com*

Robert C. Sullivan, Esquire
SULLIVAN LAW
1600 Baltimore, Suite 200
Kansas City, MO 4108
*rsullivan@sullivantrial.com*

*/s/ Robert L. Wise*
Robert L. Wise (VSB No. 42030)
BOWMAN AND BROOKE LLP
901 East Byrd Street, Suite 1650
Richmond, VA 23219-4027
Telephone: (804) 649-8200
Facsimile: (804) 649-1762
Email: rob.wise@bowmanandbrooke.com